## THE STATE OF IOWA;

IOWA CITY, JUNE TERM, A. D. 1856,

In the tenth year of the State.

---

PRESENT:

HON. GEORGE G. WRIGHT, CHIEF JUSTICE.
"    WM. G. WOODWARD, } JUSTICES.
"    L. D. STOCKTON,[1]   }

---

## MILLER *v.* CHITTENDEN *et al.*

Where a party has actual notice of the existence of a deed, he is affected by it, even though no certificate of acknowledgment is indorsed on the deed.
Where in an action for the partition of real estate, the plaintiff made certain parties defendants, set out their pretended claim to the land, averring that said claim was a cloud upon his title, and prayed for its removal; and where these defendants, in their answer, set up their title, and called upon the

2  315.<br>121  88.

---

[1] Judge STOCKTON took his seat on the bench on the 4th day of June, being the second day of the term, in place of ISBELL, J., resigned, and whose resignation took effect on that day. The cases of this term, in which opinions were delivered by ISBELL, J., are cases that were argued at the previous term, taken under advisement, and the opinions filed on the first day of this term, before ISBELL, J., left the bench.

Miller v. Chittenden et al.

plaintiff, as well as other persons, whom they made defendants, to answer as to a cross-bill; and where the parties, without making objection, did so answer, and where the parties subsequently entered into an agreement, that the case should be in all respects as a proceeding in chancery; and where on the hearing of the case in the Supreme Court, it was urged, for the first time, that the *equitable* rights of the parties to the land could not be adjudicated in this action; *Held*, That the objection was made too late.

The first section of the act, entitled, "An act relative to religious societies, approved February 7, 1844, does not limit the *quantity* or *value* of the property that may be held by a religious society, but alone restricts the *purposes* for which it may be acquired and applied.

A grant to trustees, for the use and benefit of a church to be afterwards organized, with no power in the trustees to create the beneficiary, or to appropriate the land, or funds arising therefrom, for any purpose, until such organization, will be upheld so as to pass the title, if such church shall afterwards, within a reasonable time, be so created or brought into existence, as to acquire and hold property, or be the recipients of a charity.

*Marshall* v. *Chittenden et al.* (not reported), so far as it holds that the trustees under the deed of J. McK. to C. and others, dated December 25, 1846, after the death of said McK., held the estate for his heirs, overruled.

By the common law, all grants between individuals must be made to a grantee in existence, or capable of taking, otherwise there could be no such thing as livery of seizin.

But this rule does not apply to grants or devises to charitable or benevolent purposes, and especially where the legal estate is vested in trustees, to hold for the use of the contemplated charity.

In such cases, if the intent of the donor can be ascertained, and it be legal, courts of equity will carry it out.

The exercise of jurisdiction by courts of chancery in cases of grants or devises to charities, is not dependent upon the statute of 43° Elizabeth, commonly known as the statute of charitable uses.

In this country, the jurisdiction of courts of equity over charities, must be exercised judicially, and not as a prerogative power.

If the intention of a donor can be legally executed, whether the gift is to a general charity, or to a specific object, it will be done; but if this cannot be accomplished, the claim of the heir will not be defeated, by appropriating the property to another and different object.

The doctrine of *cy pres*, at least in its original form, as administered in the English courts, has no application in this country.

A court of equity will not permit a trust to fail for want of a trustee.

Grants, devises, or dedications to public, pious, or religious uses, from the necessity of the case, form exceptions to the rule applicable to private grants, requiring a grantee as well as a grantor.

It is not necessary in such cases, that the beneficiary should, at the time of the grant, be clothed with the power or capacity of taking the benefit of the donor's bounty; but the intention of the donor will be executed, if this capacity arises within a reasonable time thereafter.

In the meantime, where the property is in the hands of a trustee, and the object and purpose of the grant look to a future grantee, it will be held in abeyance.

And it is not necessary that the trustee shall have the power to create the beneficiary, or proceed with the execution of the trust before such creation, in order to sustain and uphold such a grant or devise.

*Appeal from the Lee District Court.*

ON the 25th day of December, 1846, John McKean, being seized in fee of a certain forty acre tract of land, situated in Lee county, made the following deed, which was duly recorded, February 23d, 1847:

" Know all men by these presents, that I, John McKean, of the town of Keokuk, in Lee county, Iowa, being desirous to promote the cause of true religion in said town, have, in consideration of the sum of one dollar, to me paid by A. B. Chittenden, William Coleman, William F. Telford, Darius Wellington, and Peter Young, of the said town, granted, bargained, and sold, and by these presents do grant, bargain, and sell, unto the said A. B. Chittenden, William Coleman, William F. Telford, Darius Wellington, and Peter Young, trustees; and to their successors, forever (which said successors shall be elected, chosen, or appointed in the manner hereafter provided), in trust for the uses and purposes hereafter declared, specified, and set forth, forty acres of land situated in Lee county, aforesaid (here follows a full description of the said land), to have and to hold the said forty acres, with all the rights, members, and appurtenances thereof, unto the said Chittenden, Coleman, Telford, Wellington, and Young, trustees, and to their successors and assigns, forever. ·

" The above conveyance in trust, is hereby declared to be for the use, benefit, and support of an orthodox Congregational church, at the town of Keokuk, aforesaid, to be called and named the Congregational Church of Keokuk; and the said Chittenden, Coleman, Telford, Wellington, and Young, the trustees aforesaid, and their successors, are hereby instructed and enjoined to appropriate the forty acres of land above conveyed, and every part thereof, and all moneys arising from the sale, lease, or rent thereof, or any part

thereof, to the use, benefit, and support of the first orthodox
Congregational church which shall be organized at the said
town, under the title aforesaid; and until such church shall
be organized at the said town, the said trustees shall invest
all such moneys, and allow them to accumulate for the bene-
fit of said church, until the period of such organization; and
no funds arising from this tract, shall be appropriated to any
other object or purpose than that before mentioned, and the
reimbursement to the said trustees of their actual outlays
and expenses in the execution of the said trust; nor shall
the said trustees receive any compensation for their time or
services in the execution of their said trust.   Three of the
said trustees may make and execute valid leases of the
premises aforesaid, or any portion thereof, for the purposes
aforesaid, for any period not over seven years, but four
shall be necessary, and the same shall be sufficient, to
sell and convey the said premises, or any portion thereof,
or to lease it for a longer term than seven years aforesaid;
for all other, the ordinary business of the said trust, the
concurrence of three of the said trustees shall be sufficient to
render their acts (not contrary to the spirit and tenor of this
instrument) valid and binding.   In case of the death, re-
moval, or resignation of any one or more of the said trustees,
the others shall proceed to make choice of his or their suc-
cessors, and in all cases of choice to fill any vacancy occa-
sioned by death, or otherwise, it shall be necessary for three,
at least, of the surviving or remaining trustees to concur in
the choice of the person, or persons, to fill such vacancy, if
so many survive or remain, and if less than three remain or
survive, then all shall unite in the choice of such person, or
persons; and in case of a vacancy by resignation, or removal
from the place of any one of said trustees, it shall be lawful
for the person so resigning, or removing, to propose his suc-
cessor, and unless there shall be urgent reasons to the con-
trary, the others shall make choice of the person so proposed
to fill the vacancy.

"Whenever charges shall be preferred or promulgated
against any one of the said trustees, seriously affecting or

compromising his moral character, the others shall call in the aid of three disinterested orthodox Congregational ministers, regularly ordained and laboring as such, who shall, with the other trustees aforesaid, constitute a board or council for the investigation of the said charges; and if, after having given the accused party a fair hearing in his own defence, three of the said trustees, and two of the said ministers, shall concur in the opinion, that the said accused party is unfitted, by reason of moral delinquency, to discharge the duties of the trust hereinbefore declared and created, it shall be the duty of the said trustees to remove or expel the said trustee, and to make choice of some suitable person in his place. In all cases of the removal or expulsion of any of the said trustees, and in all cases of the choice of any person, or persons, as trustees, a statement of the fact of such choice or removal shall be made in writing, and signed by all the remaining or surviving trustees, or so many of said trustees as shall have concurred in such choice or removal, which said statement shall be deposited with one of the said trustees, who shall act as their secretary; and copies of said statement shall also be furnished to such other of said trustees as may require it, which copies shall also be signed by the other trustees, the same as the original statement. Finally, it is earnestly enjoined upon said trustees, that, in the execution of the said trust, they shall avoid all strife, bickering, and disputes—all personal and party prejudices and animosities, and all selfish objects; and that they exercise towards each other, in all matters connected with the said trust, the greatest charity, kindness, and forbearance. In witness whereof, I have hereunto set my hand and seal, this 25th day of December, A. D. 1846. John McKean, [seal]." And then follows the following certificate of the acknowledgment of said deed:

" *Territory of Iowa, Lee County, ss.*:—On this 25th day of December, John McKean came before me, and personally acknowledged that he executed the foregoing deed; and I do certify that I know the said John McKean, who made the said acknowledgment, to be the same person described in, and who executed the said deed. Given under my hand

this 25th day of December, A. D. 1846.    Jesse Hough, justice of the peace of said county." And on the same day, the said trustees mentioned in said deed, accepted said trust, as appears from the following indorsement thereon: " We, the undersigned, trustees named in the within deed of trust, do hereby accept the said trust therein declared and created; and we do further undertake and agree to execute and perform the duties of the said trust, according to the true tenor and effect of the said deed.    Dated Keokuk, December 25th, A. D. 1846.    A. B. Chittenden, William Coleman, William F. Telford, Darius Wellington, Peter Young."

On the 23d day of February, 1847, the said John McKean made and executed his last will and testament, in which he gives and bequeaths certain parcels of real estate to his executors, therein named, to be held in trust for certain children of him, the said McKean.    This will recites, in substance, that these lands are to be conveyed to these children at the expiration of ten years from the date thereof, provided the said children should continue during that time, to live a prudent, moral, and virtuous life, of which the said executors, or their successors, were to be the sole judges.    If, however, either of said children should become vicious, depraved, or abandoned, then the said executors were required, at the expiration of said ten years, to convey the portion to which such child would have been entitled, to the same persons mentioned in said deed of December 25th 1846, or their then successors in office, for the same use and purposes as in said deed mentioned, to wit: for the benefit and support of a Congregational church at Keokuk.

McKean died in a short time after executing this will, leaving a widow and several heirs.    In August, 1849, the widow and four of the heirs sold their interest in the tract of land mentioned in said deed of December 25th, 1846, to Samuel T. Marshall, one of the defendants.    Afterwards, in the years 1852 and 1853, Lewis R. Reeves, by two several conveyances from other heirs, became interested in the same property.    In March, 1853, Reeves sold a portion of his interest to Samuel F. Miller, the plaintiff, who, on the same

day, commenced this suit, making Marshall and his grantees, Reeves, such heirs of McKean as had not sold their interest, and the then trustees of said Congregational church, parties. In his petition, he sets forth the respective interests of the parties to this land; that the said trustees claim to hold the legal title to the entire tract, in trust for the church, under the deed above recited; but that said deed is of no validity, but is a cloud upon his title, which he seeks to have quieted; and he also asks a partition of the said land among the owners, according to their respective rights. To this petition, there were various answers, and supplemental answers, both on the part of Marshall and his grantees, and the trustees of the church, and replications taking issue thereon. The trustees, in their answer, set up their title under said deed; deny that plaintiff, or the other defendants, have any right or title thereto; pray that their title may be quieted; and call upon the plaintiff, and all the other defendants, to answer the same, as to a cross bill. This answer is thus responded to, the issue being distinctly made on the validity of this deed; and during the preparation of the case for hearing in the court below, the parties agreed in writing, that it should be treated in all respects as a proceeding in chancery. When this deed was executed, and at the time of McKean's death, there was no orthodox Congregational church known or organized in Keokuk. There were, however, several persons, including the trustees, residing there, who belonged to this denomination. About the year 1850, many of these persons united themselves temporarily with the Presbyterian church of that city, that church having so modified its discipline as, in the language of one witness, "to make it substantially a Congregational church." These persons, and others who did not thus connect themselves, frequently expressed their intention of organizing a church, so soon as their numbers and means were sufficient to enable them to sustain the same; and at no time does this intention appear to have been abandoned. In July, 1854, the Congregational church of Keokuk was organized, which fact is set up in a supplemental pleading, filed herein

by the trustees. The evidence also tends to show, that the trustees took possession of this land immediately after Mc-Kean's death, and rented a part of the same for various purposes, and that this possession, and the existence of this deed, were then and afterwards generally known in Keokuk, where the grantees of the McKean heirs then resided. In 1849, Marshall filed his bill in chancery against the said trustees to set aside said deed, which, after being decided in his favor, on appeal in this court, on a demurrer to the bill, is now pending in the Lee District Court. On this state of facts, the court below decreed a partition of this land, and held the said deed from McKean to the trustees to be of no validity, from which decree the said Chittenden, and the other trustees, now appeal.

*James S. Love*, for the appellants, filed the following argument:

The first proposition which we maintain is, that the jurisdiction of courts of chancery in cases of charity, existed at common law, before the statute of 43 Elizabeth, and that it was not derived from that statute. There was formerly much diversity of opinion among courts and jurists, as to the sources of this jurisdiction; some maintaining that it was derived wholly from the statute in question, and others, that it existed at common law, independent of the statute. This question, however, was put to rest by the investigation in the case of *Stephen Girard's Will*, 4 Wheat. 7. Since that decision, the courts of Maine, Vermont, Massachusetts, New York, Pennsylvania, New Jersey, Ohio, Indiana, Kentucky, North Carolina, South Carolina, Georgia, Alabama, and Tennessee, have emphatically declared that this jurisdiction was inherent in the Court of Chancery, and not derived from any statute. To the voice of the judiciary, may be added that of every American author who has written upon the law of charities, since that day. Story, in the 6th edition of his Commentaries, (§ 1454,) acknowledges his own previous error upon this subject, and his change of opinion, under the new lights reflected upon the subject by the dis-

cussion and decision in the Girard Will case, and several recent English cases.   See Story Eq. (6th ed.) § 1153.

The great Chancellor KENT had already, even before the decision in the Girard Will case, given his potential voice in favor of the inherent, and necessary jurisdiction of the court, irrespective of any statute whatever (2 Kent's Commentaries, 286), and his son, in a learned note to the 6th edition, after a full review of the authorities, declares that the decision in that case had "left the fact" of the jurisdiction prior to the statute, "indisputable," and "closed all further discussion and controversy on the subject." 2 Kent's Com. 288.   To the same purpose is the view of Willard; Willard's Eq. 570.   It would be quite useless to go further in this place, into a review of the authorities in support of a proposition which no longer admits of serious dispute.   As we proceed, the court will discover an irresistible current of authority in the American courts, in support of our position.

The chancellor exercised jurisdiction of the whole subject of charities at common law, but his jurisdiction was nevertheless twofold.   In one class of cases he interposed as delegate of the crown, exercising the king's prerogative, as *parens patriæ*, under the king's sign manual.   In another class of cases, he gave relief in his judicial capacity, and by virtue of his inherent power, as an equity judge.   In the former cases, the attorney-general was a necessary party ; in the latter, he was not a proper party.   It is, perhaps, impossible to draw a line which would exactly distinguish one class of cases from the other.   The two jurisdictions being exercised by the same officer, were not, it may be supposed, always kept perfectly distinct, but became very frequently interwoven, so as scarcely to be distinguishable at all.

In general, it may be safely affirmed, that the chancellor acts judicially by virtue of his inherent powers as judge in equity, where his duty consists in ascertaining the intentions of the donor of the charity, and in carrying those intentions into effect.   But when the terms of the donation are such, that the objects of the charity are too vague and indefinite

to be ascertained by the ordinary rules of construction; or where the object is unlawful or impossible to be attained, the arbitrary power of the chancellor, as delegate of the king's prerogative, must be invoked. To ascertain the intention of the parties to a grant or devise, and to carry that intention, if lawful, into effect, is a judicial act; but to direct the application of property to some object of charity prescribed by the court, when no object is pointed out in the grant or devise, or the object designed by the party is unlawful or superstitious, or so vague and indefinite that it cannot be attained, is an arbitrary power, requiring for its exercise the application of the extraordinary doctrine of *cy press*. It is a power rather legislative than judicial. It was exercised in England by the crown, on the principle that it was the prerogative of the king, to take care of those of his subjects who were incompetent to protect their own rights. Hence the king, as *parens patriæ*, was guardian of idiots, lunatics, and infants, and the disposer of the class of vague and indefinite charities in question. A great number of cases might be cited, illustrative of the class of charities thus falling within the scope of the prerogative powers of the court, but as we do not, in the case at bar, invoke the aid of this power, it will be unnecessary to do more than refer to the books in which they are collected and illustrated. See Story's Equity, 1166. A few illustrations may be given : Thus, where a man devised a sum of money to such charitable uses as he should direct by the codicil of his will, or by note in writing, and he afterwards left no note or codicil, it was held, that the court would dispose of it to such charitable purposes as it should think fit. Story's Equity, 1167. Again : A bequest of money to found a Jew's synagogue, which was against the policy of the law, was enforced as a charity, and transferred to the benefit of a foundling hospital! Ib. 1168. And where the literal execution becomes inexpedient or impracticable, the court will execute it as nearly as it can. Thus, a bequest for the redemption of British slaves in Turkey and Barbary, was applied *cy press*

to other objects of charity, there being no British slaves in Turkey and Barbary to redeem.  Ib. 1170.

It is quite obvious that the power by which a court carries into execution charities of the kind just mentioned, is arbitrary, not judicial.  As the case at bar does not require the exercise of any such discretion in the chancellor, I refer to the foregoing examples, merely for illustration, and for the purpose of showing with what extraordinary favor, charities have been received in the English courts.  On the other hand, where the intention of the donor is clear, and the object of his bounty definite and lawful, more especially where that object is highly beneficial to society, it would seem most strange, if the judicial department of the government were so defective in its organization, as to be destitute of the power of executing the charity.

It is not the purpose of this argument, to lay down any general principle upon which all the authorities may be reconciled.  Indeed, any such attempt, here, would be as futile as it is unnecessary.  It may, however, be affirmed, upon the authorities, both English and American, that, whenever the property is vested in trustees competent to take the same, and a lawful object of charity is pointed out, the chancellor will uphold the donation in his judicial capacity as equity judge, irrespective of any statute.  There is, indeed, an irresistible current of authority, both in England and America, which would justify me in going far beyond the proposition here asserted.  In England, it is well known, that charities are so highly favored, that the chancellor will sustain them in almost every case, where a general charitable purpose appears, although there may be no trustees to take the property, nor any beneficiaries *in esse*, nor any object of the donor's bounty pointed out, or in existence.  But, whilst many of the American courts have rejected the doctrine of *cy press*, which has enabled the English courts to assume this extensive jurisdiction, there is, in this country, an irresistible current of authority in support of the proposition, that even where no trustees capable of taking the trust, are interposed, and no persons are *in esse* in whom the beneficial

interest can vest, yet, if a lawful object of charity be pointed out, and that object is beneficial to society, the donation will be supported and upheld. It will be seen by the court, as we proceed, that the proposition just stated has been acted up in a very large majority of American cases. But it is not necessary for us, in the case at bar, to establish so comprehensive a proposition. It will be quite sufficient for our purpose, to maintain the less extensive principle affirmed above.

The right of property involves the right of giving it for the support of any object, beneficial to society, and not obnoxious to the rules and principles of law. Trusts are peculiar objects of chancery jurisdiction. What reason, therefore, can be assigned, why a court of chancery should not act judicially in compelling trustees to apply property to a definite object of charity, specified in the instrument, by which they hold the property? What is there arbitrary or prerogative, or extra-judicial, in ·the exercise of such a power? In 2 Story's Equity (§§ 1154, 1155), we find the following: "These facts and circumstances, did certainly seem to afford a strong presumption that the jurisdiction of the court to enforce charities, *where no trust is interposed*, and no devisee is *in esse*, and where the charity is general and indefinite, both as to persons and objects, mainly rests upon the constructions of the statute of Elizabeth. And accordingly, that conclusion was arrived at in a very important case in the Supreme Court. Since that time, however, the subject has undergone a more full and elaborate discussion, both in Great Britain and America." After reviewing the "more elaborate" consideration referred to, by Lord ELDON, Sir JOHN LEACH, Lord REDESDALE, and Lord Chancellor SUGDEN, Mr. Story, in section 1154, proceeds: "But the most authentic, and, at the same time, the most satisfactory information upon the whole subject, is to be found in the Report of the Commissioners upon the Public Records, published by Parliament, in 1827. From these most important documents, it appears, by a great number of cases, previous to the statute, that cases of charities, where there were trus-

tees appointed for general and indefinite charities, as well as for specific charities, were familiarly known to and acted upon in the Court of Chancery." The author, in the next section, refers to the *Girard Will Case* (2 How. 1), and says: "In this case, the court held that there was a jurisdiction in chancery, *over charitable trusts*, antecedent to the statute of Elizabeth, and that, although the statute was never in force in Pennsylvania, yet that the common law of that state had always recognized the chancery jurisdiction in cases of charity." Even "where no trust is interposed, and where there is no person *in esse* capable of taking, and where the charity is of an indefinite nature," it seems to be the better opinion, that the jurisdiction of the court is to be referred to its general equity powers anterior to the statute. Ib. 1162. See, to the same effect, still more emphatically, sections 1187—1191.

Lord EDEN, in *Moggridge* v. *Thackwell*, 7 Vesey, 36, after a full review of all the cases, came to the conclusion (which says Judge STORY, § 1190, is now the settled rule), that where there is a general indefinite purpose of charity, not fixing itself upon any particular object, the disposition and administration of it, are in the king, by his sign manual. But where the gift is to trustees, with general objects, or some particular objects pointed out, there the Court of Chancery will take upon itself the administration of the charity, and execute it under a scheme, to be reported by the masters. Thus, it appears, that in England, it never was doubted that where trustees were interposed, and some objects of charity, general or particular, were pointed out, a charitable trust was created, and the jurisdiction of the court attached, independent of the prerogative of the crown. The doubts and conflicts of authority there, grew out of charities where no trust existed, and the objects were either not in existence at all, or wholly indefinite, or against the policy of the law, or absolutely unattainable.

If we turn to the American authorities, we shall find them not less explicit, in support of the principle we are now endeavoring to maintain. Thus, in the case of *Carter and wife*

v. *Balfour's Administrators*, 19 Alabama, 821, the bequest was to the Baptist societies for foreign and domestic missions, and to the American and Foreign Bible Society. The bequest was sustained by the court, in an able judgment. Now, this was a case where there were no trustees capable of taking, and no persons in whom the beneficial interest could possibly vest. The objects of the charity, though not certain on the face of the will, could be ascertained by reference to the constitution, &c., of the voluntary societies. This, therefore, is a much stronger case than the one at bar. The subject has been most ably and learnedly discussed by the Supreme Court of North Carolina, in several cases. *Griffin* v. *Graham*, 1 Hawk. 97; *Thomas White's Executors* v. *The Attorney-General, and the Trustees of the University*, 4 Iredell, 19. In South Carolina, this question has been adjudicated, under remarkable circumstances, in the case of *The Attorney-General* v. *John A. Jolly*, 1 Richardson's Eq. 105, and 2 Strob. Eq. 397; in which case, the bequest was: To the testator's wife for life, and after her death, to the Methodist church of which she should be a member at the time of her death, to be appropriated to the uses and purposes which the conference should deem most advantageous for said church, more especially for the support of Sunday schools, for the purchase of bibles and religious tracts, and the distribution of the same among the destitute, and for the support of missionaries. So in Georgia. *Catharine E. Beall and others* v. *The Surviving Executors of John Fox*, 4 Geo. 404. So, likewise, in Kentucky. *Moore's Heirs* v. *Moore's Devisees*, 4 Dana, 354; *Attorney-General* v. *Wallace*, 7 B. Monroe, 611; *Curling's Administrators* v. *Curling's Heirs*, 8 Dana, 38. So in Maine. *The Proprietors of the Town of Shapleigh* v. *Pillsbury*, 1 Greenl. 271; *Jonathan Sewell, jr.* v. *Charles Cargill*, 15 Shepley, 414. In Mississippi. *Isaac R. Wade and others* v. *The American Colonization Society*, 7 Smedes & Marshall, 663. In Pennsylvania. *Brown* v. *Hummel*, 6 Barr, 86; *Witman* v. *Lex*, 17 Sergt. & Rawle, 88; *Terrence McGirr* v. *George Aaron*, 1 Penn. 49; *Wright* v. *Linn*, 9 Barr, 433; *Pickering* v. *Shotwell*, 10 Barr, 23. The same in

Vermont. *Luther Stone, jr.* v. *Executors of Anni Fuller and Benjamin Griffith,* 3 Vermont, 400; *Executors of Joseph Burr* v. *Richard Smith and others,* 7 Vermt. 241. In Tennessee. *Green* v. *Allen,* Dec. T. 1844; *Dickson and others* v. *Montgomery and others,* 1 Swan, 349.

The doctrines we maintain, have been firmly and emphatically upheld in the great state of New York. In the case of *Coggeshall and others, Trustees of New Rochelle* v. *Pelton and others,* 7 Johns. Ch. 292, the devise was: "I give, &c., to the town of New Rochelle, $1,200 for the express purpose of building a town-house in said town, for transacting town business, which sum I direct my executors, to pay unto such persons as the town shall appoint to receive it, at a legal town meeting." The chancellor (KENT) upheld the bequest as a valid charitable devise. See, also, *McCartee* v. *Orphan Asylum,* 9 Cowen, 439. The devise was, "to the Orphan Asylum Society of the city of New York, to be applied to the charitable purposes of the institution." In the case of *The Ministers, Elders, and Deacons of the Reformed Protestant Dutch Church* v. *Verder,* 4 Wend. 494, the court held: "That, where a grant is made to individuals for the use of a church, which, at the time of the grant, is not incorporated, as such, the persons to whom the grant is made, stand seized to the use; and when the church afterwards acquires a legal capacity to take and hold real estate, the statute executes the possession to the use, and the estate vests." In the case of *Potter* v. *Chapin,* 6 Paige, 649, WALWORTH, Chancellor, says: "The facts show conclusively, that the fund raised for the purpose of erecting a school-house, was dedicated to the inhabitants of the village for that purpose, as a donation or gift to a public charity. Although some doubt was thrown upon the question of charitable donations, for the benefit of a community or body, not incorporated so as to be capable of taking and conveying the legal title to property, by the decision of the Supreme Court in the case of *The Baptist Association* v. *Hart's Executors,* 4 Wheat. 1, I believe it is generally admitted that the decision in that case was wrong. And it may now be considered an

established principle of American law, that the Court of
Chancery will sustain and protect such a gift, bequest, or
dedication of property to public or charitable uses, provided
the same is consistent with the local laws and public policy,
where the object of the gift or dedication is specific, and
capable of being carried into effect, according to the inten-
tion of the donor."

In *The Reformed Protestant Dutch Church in Garden Street*
v. *Mott and others*, 7 Paige, 77, the facts were as follows:
In 1791, S. Bayard conveyed the premises to S. Van Court-
land and others, in fee, for the purpose of having a church
or suitable building erected thereon, for the common use of
the ministers and elders, &c., of the Low Dutch Church, which
then were, or at any time thereafter should be, within the city
of New York, professing the canons of the National Synod of
Dort, &c. The court held, that: "The conveyance was un-
questionably valid, as a charitable use, &c., and that the
court, independent of the statute of Elizabeth, relative to
charitable uses, which was never acted upon in New York,
had an original jurisdiction to enforce and compel the per-
formance of the trust." The same doctrine was maintained,
in *Kniskern and others* v. *The Lutheran Churches of St. Johns
and St. Peters*, 1 Sandf. Ch. 439, where "a grant of lands was
made in 1789 to the trustees of an evangelical Lutheran
congregation, consisting of two churches, for the common
use and benefit of the said Lutheran congregation, forever."
The same view of the law, was held by the court, in *Shot-
well's Executor* v. *Mott et al.*, 2 Sandf. Ch. 46. Here the be-
quests were to trustees, "That the interest thereof may be
distributed and divided annually, forever, under the direction
of the New York yearly meeting of friends called orthodox,
among such orthodox ministers of such society in limited
and straightened circumstances, especially those who travel
in the ministry, as the said meeting, or its committee, shall
for that purpose name and designate;" and "for the relief
of such indigent persons residing in the township of Flush-
ing, as the trustee or trustees for the time being, shall select
for that purpose," &c. Such was the current of authority in

the state of New York, until the case of *Ayres* v. *The Metho-dist Church*, 3 Sandf. 351, and the case of *Andrew* v. *New York Bible and Prayer-Book Society*, 4 Sandf. 157, arose in the Superior Court of the city of New York. In the former case, the devise was to the trustees of the Methodist Episco-pal Church in the city of New York, and their successors in office, of the lands described, in trust, to receive and apply the rents, &c., to the support of one or more worthy and moral persons, of the age of sixty years and upwards, every one of which aged persons shall live in a town or village, where there shall be at least one place or house, or place of public worship, &c. Held by the court: 1. That the reli-gious society could not take the lands by devise, &c. 2. That although the Court of Chancery in this state, may have succeeded to the jurisdiction of the English chancellor in regard to the execution and administration of charities in general, it did not succeed to the execution of charities of which the purpose is indefinite, and not fixing itself, with certainty, upon any object, and which in England, therefore, belonged to the king as *parens patriæ*. 3. That a devise, therefore, to a corporation, not capable of taking by devise, in trust, to apply the rents to aged persons, not designated by class, or otherwise than residents in a place where there should be a house of worship, cannot be executed by chan-cery, and is illegal and void, &c. This case was decided by Judge DUER, and it was soon followed by his decision in *Andrews* v. *New York Bible Society*, in the same spirit. As this last decision was reversed in the Court of Appeals, upon full discussion, and inasmuch as it is fully stated and dis-cussed in Willard's Equity, a recent and able work, I need not further consider it here.

The foregoing decisions evidently influenced, to some ex-tent, the judgment of the Supreme Court of New York, in *Yates* v. *Yates*, 9 Barbour, 339. That decision was, how-ever, based mainly upon the provisions of the Revised Stat-utes. WRIGHT, J., in delivering the opinion, says: "The better opinion seems to be, that independent of the statute of charitable uses, the English courts of equity possessed and

exercised an inherent jurisdiction over charitable trusts," &c. It is, however, unnecessary to dwell upon these decisions, since in the cases of *Williams* v. *Williams*, and *Andrew* v. *New York Bible and Prayer-Book Society*, the New York court has settled the law in that state, as we claim it to be. See Willard's Eq. tit. Charities, 594. In Massachusetts, the cases have been, if possible, still more explicit in support of the doctrines we maintain. Without adverting to the older cases, some of which are referred to in *The Proprietors of Shapleigh* v. *Pillsbury*, 1 Greenl. 271, it will be sufficient to cite the late cases of the courts of that state. In the case of *Burband* v. *Whitney*, 24 Pick. 146, the court sustained as a valid devise to charitable uses, the following bequests: " To the American Bible Society, to the American Educa- tion Society, to the American Colonization Society, and to the American Home Missionary Society, I bequeath $4,000, or $1,000 to each society, to be retained as a fund, or ex- pended immediately, as the societies shall judge best calcu- lated to promote the intended objects," &c. Some of said societies were incorporated, others, not; and their objects were various, for which, see statement of the case. This subject was also before the court in Massachusetts, in *Hadley* v. *Hopkins*, 14 Pick. 240. In *Hubbard Bartlett and others* v. *Laura Nye and others*, 4 Metcalf, 378, the devise was of real and personal estate, to the American Board of Commission- ers for Foreign Missions, and to the American Bible Soci- ety; and it was averred in the bill, and admitted by the de- murrer, that " the American Bible Society, at the time of the death of the testatrix, and of the probate of the will, was a voluntary association, established for good, benevolent, and charitable purposes, and not a society established by law." The court, in their judgment, sustain the charity, and cite and approve the observations of WALWORTH, Chancellor, in *Potter* v. *Chapin*, 6 Paige, 649, quoted above.

In *Washburn* v. *Sewall and others*, 9 Metcalf, 280, the de- vise was to the " Concord Female Charitable Society, in New Hampshire," and it appeared by the answer, that an unincorporated society existed in New Hampshire, corre-

sponding in name with the description of the devisee in the will; that said society numbered nearly one hundred members; that its objects were to provide groceries for the sick and infirm, clothing and fuel for the helpless and needy, &c. The court sustained the bequest as a charitable donation, saying, among other things : " In cases of charitable gifts, it is no objection to their validity, that no person is named capable of taking the legal interest." In *Brown* v. *Kelsey and others*, 2 Cushing, 244, the bequest was, "for the promotion of such religious and charitable enterprises, as shall be designated by a majority of the pastors composing the Middlesex Union Association." The pastors composing said association, held a meeting, and made the following appointments : " To the Orthodox Congregational Society in Shirley, the annual income of the homestead of the testatrix." The remainder of the estate, both real and personal, to " The American Board of Commissioners for Foreign Missions, two-fifths; to the Massachusetts Home Missionary Society, two-fifths; to the American Home Missionary Society, one-fifth." The court sustained the bequest. Finally, in *Winslow* v. *Cummings and others*, 3 Cushing, 359, this subject was before the Supreme Court of Massachusetts, and that court not only sustained our positions, but went far beyond what is necessary to the support of our case.

In Ohio, the subject of charities has been most ably discussed, and the view we take emphatically asserted. In the *Trustees of the McIntyre Poor School* v. *Zanesville Canal and Manufacturing Company*, 9 Ohio, 203, LANE, C. J., says: " It is admitted, that such a bequest as this would be sustained in England. However uncertain the object; whether the person to take be in *esse* or not; whether the bequest can be carried into exact execution or not; when the general charitable intention is clearly manifested, a court of equity will sustain the legacy, and give effect to it, in some form, upon principles of its own. But it is asserted by the counsel for the heirs, that this wide-reaching jurisdiction is peculiar to England, and depends upon the statute of Elizabeth only. We would not, unnecessarily, enter into the

much disputed and greatly perplexed inquiry, as to the extent of chancery jurisdiction over charities, independent of the statute. But one of the earliest elements of every social community, thrown upon its lawgivers at the dawn of its civilization, is adequate protection to its property and institutions, which subserve public uses, or are devoted to its elevation, or consecrated to its religious culture and its sepultures; and, in a proper case, the courts of our state might be driven into the recognition of some principle analogous to that contained in the statute of Elizabeth, as a necessary element of our jurisprudence. But without reference to these considerations, where a trust is plainly defined, and a trustee exists capable of holding the property, and executing the trust, it has never been doubted, that chancery has jurisdiction over it, by its own inherent authority, not derived from the statute, nor resulting from its functions as *parens patriæ*.

"The property, devised in this case, consisted of land, personalty, and stock in the Zanesville Canal and Manufacturing Company, the legal ownership of which was either in McIntyre's heirs or executors. The condition on which the devise took effect was, the death of the daughter, without issue. The objects of the testator's bounty were the poor children of Zanesville, and the benefit intended was their education. There is no doubt that a trust attached to the property, whoever might hold it; for whenever a person, by will, gives property, and points out the object, the property, and the way it should go, a trust is created. And a bequest of land to A., to construct an asylum for aged sailors, although inefficacious to pass the legal title, sufficiently defines the trust, and charges the heir with its performance. 3 Pet. 119; 1 Story's Eq. 415; 4 Wheat. Appendix. The position, therefore, taken by the heirs, that the land descended to them on the death of the daughter, absolved from the trust, is not supported, but overruled." The same matter was again before that court, in *The Zanesville Canal and Manufacturing Company* v. *The City of Zanesville*, 20 Ohio, 483, where it was held : 1. "That a gift to a

charitable use is to receive a most liberal construction. 2. That the McIntyre fund, given to establish a school in the town of Zanesville, for the poor children in said town, is not limited in its benefits to the parents of children residing in that locality which constituted the town corporate of Zanesville, at the decease of the testator. 3. That the charity will be administered for the benefit of the poor children in the town of Zanesville, according to the most general and popular sense of the term.

Finally, in *Umrey's Executors* v. *Levi Woodin and others*, 1 McCook, 161, this subject came up for adjudication again. The devise was: " To the poor, needy, and fatherless, of Jefferson and Madison townships, of the county aforesaid: to such poor as are not able to support themselves, to be divided as my executors may deem proper, without any partiality." After referring to the statute of 43 Elizabeth, the court say : " But inasmuch as that statute is not in force here, it is hence inferred, that our courts have no such power. This consequence by no means follows. On the contrary, many of its principles have long since been incorporated into American jurisprudence, and enforced by the decisions of the highest and most enlightened courts." The judge here cites and approves of *Witman* v. *Lex,* 17 Sergt. & Rawle, 88 ; *Ingliss* v. *The Sailor's Snug Harbor,* 3 Pet. 99 ; *Moore's Heirs* v. *Moore's Devisees,* 4 Dana, 355 ; *Trustees of McIntyre Poor School* v. *The Zanesville Canal & Manufacturing Company,* 9 Ohio, 287. In this case, the property is, by will, expressly vested in the executors, and they are made trustees to apply the fund, from time to time, to relieve the necessities of the poor and needy in the townships named. The trustees exist, to take and hold the property, and they are charged to seek out, and apply it to the objects of the testator's bounty. These objects are as clearly pointed out, as the nature of the case will admit, and as little as possible left to the discretion of his trustees.

The whole subject of charities, was ably discussed by the Supreme Court of Indiana, in the case of *McCord* v. *Ochiltree,* 8 Blackf. 15. The devise was to " the Theological

Seminary at South Hanover, in the state of Indiana, all the remainder of my estate, to continue a permanent fund, and the interest to be applied to the education of pious, indigent youths, who are preparing themselves for the ministry of the gospel, and those only who strictly adhere to the Westminster confession of faith, in its literal meaning." The said seminary, at the death of the testator, was an unincorporated association, and it was held, that the bequest was void at law, because the objects of the testator's bounty are too vaguely indicated, to enable them to take the legacy, without the interposition of a trustee, and because there was, at the death of the testator, no existing trustee capable of executing the trust, intended to be created by the will. The courts of equity of this state possess the power, in addition to the usual jurisdiction of a court of chancery, of taking cognizance of, and protecting the rights and property of infants, idiots, and lunatics, and of superintending and enforcing charities. The principles of the statute of 43 Elizabeth, chap. 4, commonly called the statute of charitable uses, with one or two exceptions, have been adopted, and are in force in this state. Such a bequest as that above mentioned, though void at law, will be enforced in equity, as a charity, both in reference to said statute of Elizabeth, and to the law of charities, independent of that statute.

In considering the cases in the Supreme Court of the United States, it is necessary to advert to what is said by that court, in *Wheeler* v. *Smith*, 9 How. 78, the result of which is, that in deciding questions involving titles to land, that court will follow the decisions and laws of the state courts. Upon this principle, the case of *Wheeler* v. *Smith*, was decided under the laws of Virginia.

The case of *The Baptist Association* v. *Hart's Executors*, 4 Wheaton, 1, is not in point here. 1. Because there were no trustees capable of executing the trust; 2. Because there was no definite object of charity. The objects of the charity were evidently intended to be selected and appointed by the trustees. The object was for the " education of youths of the Baptist denomination, who *should appear promising for*

*the ministry.*"  The charity did not fix itself upon any par-
ticular class of individuals. · It was left to the trustees to de-
termine what particular youths should appear "promising
for the ministry," and, as the trustees appointed were incom-
petent to take the trust, and to make the appointment, there.
was no means provided of making that certain, which was,
in itself, wholly indefinite and uncertain.  The Court of
Chancery could have done nothing but appoint a trustee to
take the property, and carry out the will of the testator.
This could not' be done, without utterly contravening the
will of the testator; for he had appointed the Baptist Asso-
ciation, and committed to them the duty of making the se-
lection.  It was a special confidence and trust, reposed in
them by the testator.  It was not his will, that any other
person or persons should select the objects of his bounty.
Now, the court could not authorize the Baptist Association
to hold the property, and perform the trust, because they
were, in law, incompetent.  Neither could the court appoint
any other trustee, because that was not the will of the testa-
tor.  There was no one to be called to account for the non-
fulfillment of the trust, and no ascertained object, to which
the testator's bounty could be applied by the court.

The case at bar is, in all these respects, wholly different.
There were, at the time of the conveyance, trustees capable
of taking and holding the property, and performing the
trusts.  The objects of the bequest were fixed, definite, and
certain, though future, which we have seen, is no objection
to the validity of the grant.  Now, what is the principle de-
cided by the court in the case last cited?  It is this, in the
very words of the court:  "Charitable bequests, *where no
legal interest is vested,* and which are *too vague to be claimed by
those for whom the beneficial interest was intended,* cannot be
established by a court of equity, either exercising its ordi-
nary jurisdiction, or enforcing the prerogative of the king as
*parens patriæ,* independent of the statute of 43 Elizabeth."
In the case at bar, there is a legal interest vested, clearly.
There is, also, an existing organization, capable of receiving
the beneficial interest.  There were, indeed, many other

principles laid down by Chief Justice MARSHALL, in the course of his opinion, but they were out of the case, as he, himself, expressly admits, at the close of his argument.   It is true that the chief justice in that case, affirms that there was, in England, no jurisdiction over the subject of charities of the kind then in question, prior to the statute of 43 Elizabeth, and that the jurisdiction referred to, resulted from that statute; and such was the prevailing opinion of some courts and authors, at that day, and, indeed, up to the time when the case of *Vidal* v. *Girard's executors*, 4 How. 127, was discussed and decided in the Supreme Court of the United States.   It is almost unnecessary to add, that this view of the jurisdiction of courts of chancery, is now universally admitted to have been erroneous.   Beside the emphatic admission of Mr. J. STORY, in the Girard Will case, and the overwhelming current of authority in the state courts, since the last-named case was decided, we have the declaration of the present chief justice of the United States, in *Fountain* v. *Ravenal*, 17 Howard, 369, to the same effect.

The decision in the case of *The Baptist Association* v. *Hart's Executors*, seems to have proceeded mainly upon the fact that the statute of 43 Elizabeth, had been repealed in Virginia.   Now the fact of its repeal, implies that it had once existed, and during its existence, it must have been regarded as the law of charities in that state.   By the act of repealing it, the legislature certainly disapproved of, if they did not abrogate, the law of charities in Virginia.   Indeed, it seems impossible to avoid the conclusion that the repeal of the statute, left that state without any law of charities; for the statute of 43 Elizabeth, defined what should thereafter be considered charities, and in this, as we contend, it but affirmed the common law.   Now, the repeal of the statute, without any re-affirmance of the common law on that subject, might well be considered a total abrogation of the law of charities, as known at common law.   Hence the case of *The Baptist Association* v. *Hart's Executors*, can have no authority in Iowa.   I do not know that the case itself has been overruled; nor is it important to my purpose to show

that it has been; but the assertion of the chief justice, that the juris-liction of courts of chancery was derived from the statute 43 Elizabeth, has been denied and utterly refuted, not only in his own court, but in a great many of the American state courts, as we have seen from the cases cited and read to the court. The case itself, not being in point here, and the position it assumes in relation to the jurisdiction of the court having been overthrown, it can carry no authority in the decision of the case at bar. The subject of charities has been frequently discussed in the Supreme Court of the United States, since the decision in *The Baptist Association* v. *Hart's Executors*, and from that time until the adjudication in *Vidal* v. *Girard's Executors*, 2 How. 128, there has been a constant struggle to disengage the court from the embarrassing assertion of Chief Justice MARSHALL, in relation to the source from which the jurisdiction of the court is derived. Thus in the case of *Beaty & Richey* v. *Kurts and others*, 2 Peters, 566, there is an evident attempt by Judge STORY to place the decision on special grounds, without much apparent success. In this case, a lot of ground had, in the original plan of an addition to Georgetown, been marked "for the Lutheran Church." The bill was filed for an injunction and to quiet title, by Kurts and others, trustees of the German Lutheran Church of Georgetown, against the heir at law of the town proprietor. The church was a voluntary association at the time of the filing of the bill. Mr. Judge STORY says: " As to the first named question, it is not denied that Charles Beaty did originally intend that this lot should be appropriated for the use of a Lutheran church in the town laid off by him. But as there was not, at that time, any church, either corporate or unincorporated, of that denomination in that town, there was no grantee capable of taking the same, immediately by grant. Nor can any presumption of a grant arise from the subsequent lapse of time, since there never has been any such incorporated Lutheran church there, capable of taking the donation. If, therefore, it were necessary that there should be a grantee legally capable of taking, in order to support the dona-

tion in this case, it would be utterly void at law, and the land might be resumed at pleasure. If the appropriation, therefore, is to be deemed valid at all, it must be upon other principles than those which ordinarily apply between grantor and grantee. And we think it may be supported as a dedication of the lot to public and pious uses. The bill of rights of Maryland, gives validity to any 'sale, gift, lease, or devise, of any quantity of land not exceeding two acres, for a church, meeting-house, or other house of worship, and for a burying-ground, which shall be improved, enjoyed, or used only for such purpose.' To this extent, at least, it recognizes the doctrines of the statute of Elizabeth for charitable uses, under which it is well known that such uses would be upheld, although there was no specific grantee or trustee. In the case of the *Town of Pawlet* v. *Clarke*, 9 Cranch, 292, this court considered cases of an appropriation or dedication of property to public or religious uses, as an exception to the general rule requiring a particular grantee, and like the dedication of a highway to the public."

The court here attempt to base their decision, upon the recognition of the statute 43 Elizabeth in the bill of rights of Maryland; but I do not see how this can be, since there is not the slightest allusion in the bill of rights to that statute. But if this clause of the bill of rights can be regarded as a recognition of the statute of 43 Elizabeth, with much stronger reason may the same be said of our statute in relation to religious societies, which provides that such societies shall have power and authority " to contract, acquire, hold, enjoy, bargain, and sell, lease, mortgage, convey, and dispose of, any building or buildings erected for public worship, with the land necessary therefor ; a burying-ground and parsonage for such society ; and such other property as shall be applied to the support of public worship in such society, and to such means of education and charity as may be therewith connected." It will be seen that the case just cited, is in point to the case at bar. In each of these cases, the property is conveyed by grant; in both, the beneficiaries are a religious society, not in exist-

ence at the time of the grant.   What difference does exist, is manifestly in favor of the case at bar; for, in this case, trustees are interposed, capable of holding the legal title, and applying the proceeds of the property to the objects of the grant.

The case of *Ingliss* v. *Trustees of the Sailors' Snug Harbor*, 3 Peters, 99, was a writ of right by the heir at law of the devisor, against the trustees of the charity.   The devise out of which the question rose, was this:   The testator gave all the residue of his estate, comprehending a large real estate in the city of New York, to the chancellor of New York, the city recorder of New York, &c. (naming several other persons by their official description), in trust, out of the rents and profits, to erect upon the land upon which he resided, an asylum or marine hospital, to be called "The Sailors' Snug Harbor, for the purpose of maintaining and supporting aged, decrepid, and worn out sailors," &c.   Within five years after the death of the testator, the legislature of New York, on the application of said trustees, incorporated them under the name of the Trustees of Sailors' Snug Harbor, and enabled them to execute the trusts declared in the will.   The court sustained this bequest, and they labor to distinguish this case from that of *The Baptist Association* v. *Hart's Executors;* and Mr. Justice THOMPSON, delivering the opinion, says: "In the case of *The Baptist Association* v. *Hart's Executors*, 4 Wheat. 27, the court considered the bequest void, for uncertainty, as to the devisees, and the property vested in the next of kin, or was disposed of by some other provision of the will.   If the testator had, in that case, bequeathed his property to the Baptist association, on its becoming thereafter, or within a reasonable time, incorporated, could there be a doubt but the subsequent incorporation would have conferred on the association, the capacity of taking and managing the fund?"

From this explanation of the case of *The Baptist Association* v. *Hart's Executors*, it is obvious, that the real difficulty in that case was, not the uncertainty of the ultimate beneficiaries, but the want of trustees capable of taking.   Indeed,

the analogy between that case and the present one, so far as the ultimate beneficiaries are concerned, is quite perfect. In the one case, it was "youths of the Baptist denomination, who should appear promising for the ministry;" in the other, "aged, decrepid, and worn out sailors." In both, the beneficiaries were uncertain, but capable of being made certain by the action of the trustees. It is clear that, in both cases, the objection was, the want of competent trustees. In the case of *The Baptist Association* v. *Hart's Executors*, if the association had been capable of taking the property as trustees, at the time of the devisor's death, or within a reasonable time thereafter, the devise would have been upheld. It is manifest, therefore, that the objection in that case has no application whatever, to the case at bar. I should, perhaps, have stated, that in the case just cited from 3 Peters, the court held, that the trustees named in the will, being described by their official capacity, were incapable of taking as trustees, until they became incorporated.

Such were the decisions in the Supreme Court of the United States, when the great case of *Vidal* v. *Girard's Executors*, 2 Howard, 128, arose in that court. The bill was filed by the heirs-at-law of Stephen Girard, to have the devise of the residue and remainder of the real estate, to the mayor, aldermen, and citizens of Philadelphia, in trust, as hereinafter mentioned, declared void, &c. The devise was to the mayor, &c., and their successors, in trust, that no part of the real estate should ever be sold or alienated, but the net proceeds appropriated to the erection of a college in the city of Philadelphia, sufficient to accommodate, at least, 300 scholars, and the requisite number of teachers, &c., and for the education therein, of as many "poor white male orphans, between the ages of six and ten years old," as the income of the residue of the property, real and personal, should be adequate to maintain; the preference among applicants, when the same should be greater in number than the vacancies, to be given, first, to orphans born in the city of Philadelphia; second, to those born in other parts of Penn-

sylvania; third, in the city of New York; and, lastly, in the city of New Orleans.

It can scarcely be necessary for me to remind this court, that the Supreme Court of the United States sustained the will of Mr. Girard, and that, under the light shed upon the subject of the jurisdiction of the Court of Chancery over charities, by some fifty cases, produced by Mr. Binney, from the then recent publications of the commissioners, on the public records in England, Mr. Justice STORY, in delivering the opinion of the court, disapproved of the dictum of Chief Justice MARSHALL, in *The Baptist Association* v. *Hart's Executors*. The court says: "Several objections have been taken to this bequest, &c. In the first place, that the corporation of the city is incapable, by law, of taking the donation for such trusts. This objection has already been sufficiently considered. In the next place, it is said, that the beneficiaries, &c., are too uncertain and indefinite, to allow the bequest to have any legal effect; and hence, the donation is void, and the property results to the heirs. And, in support of this argument, we are pressed by the argument, that charities of such an indefinite nature, are not good at common law, and hence, the charity fails, and with the decision of the court in *The Baptist Association* v. *Hart's Executors*, 4 Wheat. 1, as fully in point. There are two circumstances which materially distinguish that case, from the one now before the court. The first is, that the case arose under the law of Virginia, in which state the statute of 43 Elizabeth, chapter 4, had been expressly and entirely abolished by the legislature, so that no aid whatever could be derived from its provisions, to sustain the bequest. The second is, that the donees (the trustees) were an unincorporated association, which had no legal capacity to take and hold the donation in succession, for the purposes of the trust, and the beneficiaries were also uncertain and indefinite. Both circumstances, therefore, concurred; a donation to trustees incapable of taking, and beneficiaries uncertain and indefinite."

Judge STORY then proceeds with a careful analysis of the English cases, to show that the weight of authority in

England, was in favor of the jurisdiction of the court, independent of the statute of 43 Elizabeth, and says: "But very strong additional light has been thrown upon this subject, by the recent publication of the commissioners on the public records in England, which contains a very curious and interesting collection of the chancery records, in the reign of Queen Elizabeth, and in the earlier reigns. Among these, are found many cases in which the Court of Chancery entertained jurisdiction over charities, long before the statute 43 Elizabeth,. and some fifty of these cases, extracted from the printed calendars, have been laid before us. They establish in the most satisfactory and conclusive manner, that cases of charity, where there were trustees appointed, for general and indefinite charities, as well as for specific charities, were familiarly known to, and acted upon, and enforced in, the Court of Chancery. In some of these cases, the charities were not only of an uncertain and indefinite nature, but, as far as we can gather from the imperfect statement in the printed records, they were also cases where there were either no trustees appointed, or the trustees were incompetent to take. These records do, therefore, in a remarkable manner, confirm the opinions of Sir J. JEKYLL, Lord NORTHINGTON, Lord C. J. WILMOT, Lord REDESDALE, and Lord Chancellor SUGDEN. Whatever doubts, therefore, might properly be entertained on this subject, when the case of *The Trustees of the Baptist Association* v. *Hart's Executors*, 4 Wheat. 1, was before this court (1819), those doubts are entirely removed by the later, and more satisfactory, sources of information, to which we have alluded."

Now, in what is the case just cited, distinguishable from the case at bar? In that case, there were trustees capable of taking the property, and performing the trust;—so in this. In that case, the objects of the testator's bounty, were far more indefinite than in the case now before the court. "Poor orphan children"—who were they? How, and by whom, was the discrimination between those who were poor, and those who were not poor, to be made? Moreover, they who are poor to day; may be quite otherwise to-morrow, and

they who are to-day wealthy, may be reduced to poverty before the· close of another day; so that the beneficiaries of such a charity as Mr. Girard's, must be ever changing and fluctuating.  Hence, it is clear, that there were no persons ascertained, at the time when the will took effect, in whom the beneficial interest could vest.  At a hasty glance, the case of *Wheeler* v. *Smith and others,* 9 Howard, 55, might be supposed to be in conflict with that of *Vidal* v. *Girard's Executors;* but a careful examination will clearly show, that there is no conflict whatever between them.  The case of *Wheeler* v. *Smith,* arose in Virginia; the devise was to " Hugh Smith and others, for such purposes as they should consider most beneficial to the town and trade of Alexandria."  The court do not profess, even, to disapprove of any previous case; on the contrary, they expressly recognize the authority of the case of *Vidal* v. *Girard's Executors,* and base their decision upon the existing laws of Virginia, and the decisions in that state.  The object of the bequest, was very uncertain and indefinite. · Indeed, it was almost wholly discretionary with the trustees.  The court say: " Under this· devise, how can a court of chancery correct an abuse of the trust?  By what means shall it ascertain a misapplication of the fund?  There is nothing to restrain the discretion of the trustees, or to guide the judgment of the court.  If the trust can be administered, it must be administered at the will of the trustees; substantially free from all obligation.  But before we pronounce upon the character of this trust, it is important to ascertain by what law, it is to be governed.  Is the common law of England, in relation to charities, as modified and enlarged by the statute of 43 Elizabeth, in force in Virginia? "  Again:  " From this, it appears, that what may be the common law of one state, is not necessarily the common law of any other.  We must ascertain the common law of each state, by its general policy, and the usages sanctioned by its courts and statutes.  And there is no subject of judicial action, which requires the exercise of this discrimination, more than the subject of charities.  No branch of jurisprudence is more dependent than

this, upon the forms and principles of the common law. In
this view, we must look to the laws of Virginia as govern-
ing this bequest." Referring to the repealing act of 1792
(in Virginia), the court continue: " The statute of 43 Eliz-
abeth, if it ever was in force in Virginia, was repealed by
the above act. Some of the principles applicable to this
case, were considered by the court in *The Baptist Association*
v. *Hart's Executors*, 4 Wheaton, 1." After quoting a part
of the opinion in that case, the court proceed: "And it
was said" (in *The Baptist Association* v. *Hart's Executors*),
"that the statute of 43 Elizabeth had been repealed in Vir-
ginia." "In the case of *Gallego's Executors* v. *Attorney-Gen-
eral*, 3 Leigh, 450, the court held: That the English statute
of charitable uses, 43 Elizabeth, having been repealed in
Virginia, the courts of chancery have no jurisdiction to de-
cree charities, where the objects are indefinite and uncertain."
Again: "The case of *Vidal* v. *Girard's Executors*, 2 How.
127, was decided under the law of Pennsylvania. The
court say: 'It has been decided by the Supreme Court of
Pennsylvania, that the conservative principles of the stat-
ute of Elizabeth, have been in force in Pennsylvania, by
usage,' &c. The *cestuis que trust*, are the town and trade of
Alexandria. It would be difficult, to express in more indefi-
nite language, the beneficiaries of a trust. How can a
court of chancery administer this trust? On what ground
can they remove the trustees, for an abuse of it? The dis-
cretion of the trustees may be exercised without limitation,
excepting that the fund must be applied for the benefit of
the town and trade of Alexandria. And if the application
of the fund be, however remotely, connected, with the ob-
jects of the trust, the judgment of the court could not be
substituted for the discretion of the trustees. It is doubtful,
whether so vague a bequest, could be sustained under the
43d of Elizabeth. Without the application of the doctrines
of *cy pres*, it could not be carried into effect. In Virginia,
charitable bequests stand upon the same footing as other
trusts, and consequently, require the same certainty, as to
the objects of the trust, and the mode of its administration."

The great case arising under McDonough's will, came before the Supreme Court of the United States, at its December term, 1853. The bill was filed by the heirs at law, to set aside so much of the will as gave the property of the testator to the corporations of New Orleans and Baltimore, for the free education of the poor of New Orleans and Baltimore. Now, the object of the bequest here, is sufficiently certain, as it is in the case at bar, namely, the education of the poor of said cities, in one case, and the support of a Congregational church, in the other; but the beneficiaries in the McDonough will case are quite indefinite. How could this bequest be upheld, except upon the principles we maintain? This case certainly raises the strongest possible presumption, that the court regarded the question of the validity of a donation to charitable uses, where trustees capable of taking are interposed, and the object of the grant definite and certain, as a settled point in that court. *McDonough's Executors* v. *McDonough's Heirs*, 15 How. 367.

In *Gallego's Executors* v. *The Attorney-General*, 3 Leigh, 455, CARR, J., says: "The course of decisions in England, was admitted on the other side, but it was contended, that they rested entirely on the statute of 43 Elizabeth, and did not at all belong to the ordinary powers of a court of equity. This was the only serious question. I certainly shall not discuss it; for I find this completely done to my hand by Ch. Justice MARSHALL, in the case of *The Baptist Association* v. *Hart's Executors*. The cases cited and examined, and the reasons given by him, prove conclusively to my mind, that in England charitable bequests, where no legal interest is vested, and which are too vague to be claimed by those for whom the beneficial interest was intended, cannot be established by a court of equity, either exercising its ordinary jurisdiction, or enforcing the prerogative of the king, as *parens patriæ*, independent of the statute 43 Elizabeth; and as that statute, if ever in force here, was repealed in 1792, I conclude that charitable bequests stand on the same footing with us as all others, and will alike be sustained or re-

jected by a court of equity. I think the bill of the attorney-general must be dismissed."

The case of *Dashiell* v. *Attorney-General*, 5 Harrison & Johnson, 392, was a bill by the attorney-general, on the relation of numerous parties entitled under the will, to enforce the execution of the trusts. BUCHANAN, J., says: "The peculiar law of charities originated in the statute 43 Elizabeth, for regulating charitable uses; and independent of that statute, a court of equity cannòt, in the exercise of its ordinary jurisdiction, sustain and enforce a bequest to charitable uses, which, if not a charity, would, on general principles, be void; and in this we are supported by the Supreme Court of the United States, in the case in 4 Wheat. 1, in which all the principal cases are reviewed, and the subject very fully investigated." This is all that is said by the court on this head.

Upon the foregoing cases in Virginia and Maryland, it is only necessary to observe, that they were decided upon the authority of *The Baptist Association* v. *Hart's Executors*, and under the influence of the erroneous notions which then *prevailed*, in relation to the jurisdiction of courts of chancery, prior to the statute of 43 Elizabeth.

I see nothing to distinguish the case at bar, from that large class of cases in which grounds are dedicated to the use of the public, for churches, public buildings, streets, highways, &c. The proprietor of a town marks upon his plot, certain lots and squares for churches and public buildings, streets, and public landings. There is no grantee in existence at the time, in whom any interest whatever, legal or equitable, can vest. Was it ever supposed that in such a case, the grant must fail, by reason of the want of a grantee? But it may be asked, suppose the grantees never come into existence, what becomes of the property? I answer, that it reverts to the grantor. Indeed, I have no doubt that the grantor, after the lapse of a reasonable time, might resume his ownership, perhaps without the aid of a court of equity, certainly with it. The case of *White's Lessee* v. *The City of Cincinnati*, 6 Peters, 431, strongly illus-

trates this point. In that case, the proprietors at the time of laying off the city, left a gore of land adjoining the river, which was called a common, and so marked on the original plot of the town.

The true principle is clearly laid down by LANE, C. J., in *Brown* v. *Manning*, 6 Ohio, 303, where he says: "The subject of appropriations to public uses, has been frequently under the consideration of our courts, and it is now settled, that where lands are dedicated by the owner to any lawful use, public, pious, or charitable, and are used for the object, and in the manner contemplated by the owner, it enures as a grant. The existence of a grantee is not essential to the validity of such dedication; nor is any form of words necessary to give it effect. If accepted, and used by the public in the manner intended, it works an estoppel in *pais,* precluding the donor, and all claiming in his right, from asserting any ownership, inconsistent with such use." The case of *Clerq* v. *Gallipolis,* 7 Ohio, 219, and *Thornhill* v. *McCandlis,* 7 Ohio, 135, are upon the same principle.

Now it would be quite absurd, for the proprietor of a town or city, to dedicate certain grounds to public uses, and to resume the grant immediately, by reason of the non-existence of the institutions intended to be created or endowed by the grant itself! But if, in such a case, the grounds were not within a reasonable time, appropriated to the uses intended, it would be quite reasonable that they should be restored to the grantor. What would be a reasonable time, must depend altogether upon circumstances.

What are the circumstances of this case? Why was not a church organized at an earlier day? Let the testimony of D. W. Kilbourne and others, answer these questions. The conveyance was executed by John McKean, in 1846. The property was then worth about $400. It was, at that time, and, indeed, until after the death of Mr. McKean, wholly insufficient to build and support a church. The members of the denomination in Keokuk, to whose use and benefit the property was dedicated, were few in number, and they did not feel able to sustain a church until the fund,

arising from Mr. McKean's bounty, became available. It would have been highly imprudent for them to have done so. Hence, they wisely postponed the organization of a church, until the fund became available; never, however, for a moment, abandoning the intention of doing so, and of appropriating the land. In the meantime, Mr. McKean died, having recognized in his will the previous grant. The pious and benevolent man was scarcely in his grave, before this assault was commenced upon the title by which the trustees held this property. It is clearly established by the testimony, that a church would long since have been organized, and the property applied to its legitimate object, but for this very litigation, which has to this day, rendered the fund unavailable. The benevolent and disinterested gentlemen who stand opposed to us in this case, purchase for a valuable consideration the interest of Mr. McKean's very enlightened heirs, and obtain from them quit-claim deeds, just about the time that the property becomes valuable. They cast a cloud upon the title; they prevent any revenue from accruing from the property; they thus defeat the organization of a church; and now they modestly ask this court to defeat the bountiful purpose of the donor altogether, because the church was not organized at an earlier day. How keen and piercing is the logic of the land speculator! How astute he is, in finding out the flaws of the law! How admirable his sense of justice, to the sacred memory of the benevolent dead, and the rights of the living!

Let me restate his case. Some foolish old man, affected with the absurd idea of doing good to his fellow men, gives a part of the earning of a toilsome life, to some great and worthy public charity. He conveys property to trustees, if you will, for the purpose of building and maintaining a hospital for the insane. While the trustees are waiting for the accumulation of the fund, to such an amount as to justify the building of a house, and the organization of the asylum, the benevolent donor dies, and the astute land speculator, taking advantage of the weakness or cupidity of his heirs at law, obtains a deed for their interest, and involves

the whole charity in litigation.  Thus, the fund is rendered wholly unavailable, and the organization of the institution is prevented.  Having done this great wrong, not only to the deceased grantor, whose right it was to appropriate his property to this benevolent purpose, but to the houseless, homeless, afflicted, class of persons intended to be benefited; he comes into a court of equity, with a prayer that the court will aid him in taking advantage of, and consummating, his own wrong, by overturning the charity altogether, on the ground that no institution was actually organized at the time of the commencement of his suit, and all this for the wise and most equitable purpose of putting money in the purse of the speculator, arising from the toil and care of another man.

Indeed, the principle that there must be a grantee *in esse*, never did apply to the beneficiaries of an estate in trust.  It was a principle of the common law, founded upon feudal reasons, and applicable only to the legal title.  Lands being held under the feudal system, by the tenure of military and other services, it was necessary, that there should be a grantee in existence, capable of performing the feudal services.  The policy of that law was, therefore, hostile to estates in abeyance.  Moreover, an insuperable obstacle to the creation of estates *in futuro*, grew out of the feudal mode of conveyance.  Lands could only be conveyed by open and public investiture, in the presence of the retainers of the lord of the fee (who were the witnesses of the fact), by livery of seizin, with appropriate signs and symbols.  This resulted from the ignorance of the feudal proprietors, most of whom were so unlettered, as to be quite incapable of conveying land by charter or writing.  Hence, too, the objection to estates in abeyance, and to the creation of titles *in futuro*, did not apply to wills and testaments, which grew up under the statute of wills, after the feudal law became much relaxed in England.  By way of executory devise, an estate could be created, to take effect, subsequent to the death of the testator, because no livery of seizin was necessary, and no feudal services required by the grantee.  The introduction of trusts, also avoided these technicalities of the common law under the feudal system.

It is urged that the deed, in this case, is void, because at the time of the grant, there was no church of the denomination specified in existence, either corporate or otherwise. The very terms of the deed, looked to the future organization of a church. The object of the charity, was clear and certain. It was evidently, the religious instruction and edification of *persons* attached to the denomination to which the the grantor belonged, by the preaching of the gospel to them, and ultimately, by that means, the general improvement in religion and morals, of the place where the church was to be established. To effect this object, a church was thereafter to be organized. There were persons in existence, residing in the town of Keokuk, of the religious denomination specified. This we have proved. Indeed, the very trustees in the deed, were persons of that denomination. In the nature of all such cases, the persons to be immediately or remotely benefited, must be uncertain and fluctuating. The class exists, but the individuals are indefinite.

Now, this case is precisely analogous to that large class of cases to be found in the books, in which property has been given for the endowment of schools, for the education of poor and orphan children, and the establishment of asylums and hospitals, for the indigent and the unfortunate. Thus, in *Griffin* v. *Graham*, 1 Hawkins, 97, the bequest was to trustees, for the establishment and support of a school thereafter to be erected in the town of New Burn, for the education of indigent scholars :—so, in *Vidal* v. *Girard's Executors*, the fund was for the support of a college thereafter to be organized, for the education of " orphan children." So, in *The Zanesville Canal and Manufacturing Company* v. *McIntyre's Executors*, the devise was for a school to be organized at some future time, for the education of the poor children of the town of Zanesville. And in *Ingliss* v. *The Trustees of the Sailors' Snug Harbor*, the devise looked to the future erection and organization, of an asylum for " disabled seamen." To the same effect substantially, is *Moore's Heirs* v. *Moore's Devisees*, 4 Dana, 354; and the case in 8 Dana, 38. In *Wade* v. *The American Colonization Society*, 8 Smedes

& Marsh. 610, the bequest was to the American Colonization Society, in trust, for the establishment of " one single seminary or institution of learning in Liberia." So, in *Brown* v. *Hummel*, 6 Barr, 86, where the devise was to trustees, to establish a perpetual charity, for the education of poor orphans, and the erection of an asylum house, to be called " Emaus." So, in *Witman* v. *Lex*, 17 Sergt. & R. 88. So, 9 Barr, 423. A great many other cases of the same class, in England as well as the United States, might be referred to, but it is deemed unnecessary to our purpose.

Can this court doubt, for a moment, that the cases cited above, were correctly decided? Could this tribunal have decided them otherwise? I think not; and it seems to me quite impossible to distinguish them, in principle, from the case at bar. In the cases cited, the objects of the bounty were sufficiently certain,—" the education of the poor," &c., but the organization through which those objects were to be attained, were not in existence, and were thereafter to be created; children could not be educated, without the erection of school-houses, the employment of teachers, and the organization of schools. All this was in the contemplation of those who made the donations. The persons who were to be immediately benefited by these charities, may be supposed to have existed; for it is reasonable to presume, that there were, at all times, poor children in Philadelphia, and disabled seamen in New York; but these beneficiaries were evidently not designated, at the time, that the property passed out of the donor or grantor; and moreover, they were constantly liable to change and fluctuate, to increase or diminish, in number. There were evidently no beneficiaries in which any interest could possibly vest. I submit that in the case at bar, the beneficiaries are less uncertain and indefinite, and the objects of the charity quite as certain.

No man doubts, I presume, that property may, in Iowa, be given, by will or deed, to trustees, in aid of institutions of learning and benevolence, in actual existence at the time of the grant or devise; for the support of schools and colleges; hospitals for the insane; and asylums for the blind,

the deaf, and the dumb. To deny this right, would be to suppress the best impulses of the human heart; to stay the outstretched hand of "heavenly" charity, and to ignore the noblest, the most humane, and the most useful, institutions of the land. Now, if it be competent for a man to give his property for the support of such institutions in actual exist-ence, why not for the support of those which are hereafter to be created, and in contemplation of their establishment? Nay, why may he not provide for bringing such institutions into existence, and the support of them when they are cre-ated. What difference is there in *principle*, in the two cases?

But there are many cases precisely in point, upon this question. Thus, in 2 Story's Equity (§ 1190, note 2), it is said : "If the object of the gift be certain, but *not at present in existence ;* yet if its existence may be expected hereafter, the court will neither consider the gift lapsed, nor apply it to a different use "—citing *Aylet* v. *Dodd*, 2 Atk. 238 ; *Atty. Gen.* v. *Lady Downing*, Ambl. 571; *Atty. Gen.* v. *Oglander*, 3 Bro. Ch. 166. So, in 2 Kent's Com. (6th ed.) 288, note *a*, we find it stated, that "In the case of *Milne* v. *Milne*, 17 Louis. Ch., under the will of Alexander Milne, in which legacies were left to two public charitable asylums, to be after the death of the testator, incorporated, and established at Milneburgh, it was held, that the courts were bound to aid in carrying out the intentions of the will." See *Pro-prietors of Town of Shapleigh* v. *Pillsbury*, 1 Greenlf. 271 ; *The Town of Pawlet* v. *Clarke and others*, 9 Cranch, 330 ; *Kurts* v. *Trustees of the Lutheran Church*, 2 Peters, 566 ; *In-gliss* v. *Trustees Sailors' Snug Harbor*, 3 Pet. 99 ; *Andrew* v. *New York Bible Society*, 4 Sandf. 178, stated in Willard on Eq. Jurisprudence, 593, where it is shown to have been re-versed ; *Winslow* v. *Cumings*, 3 Cushing, 358.

*J. C. Hall*, for the other appellants, argued as follows : In this case, I admit :

1. That the trustees named in the deed, could take the property granted if there had been certain beneficiaries in existence.  2. That the deed is sufficient, so far as the words

Miller v. Chittenden et al.

of grant are concerned, to vest in the trustees a fee simple title. To these admissions, I add these points, as true rules in relation to devises and grants, made for charitable uses and purposes:

1. That a devise or grant to a corporation capable of holding, or a person or persons by name, for a definite and specific use, is good at law ; and the powers of a court of chancery are confined to the mere execution of the trust, to secure the faithful application of the fund or property, to the use and object indicated in the deed or will ; in other words, to carry out the intention of the donor.

2. That where there is a devise or grant to, and for a specific charitable use or object, and the grant or devise does not appoint trustees, or the trustees refuse or fail to act, the court will interpose and supply trustees, and carry out the intention of the donor, and secure to the objects of the grant or devise, the benefits intended.

3. Where there is a devise or grant for the benefit of a recognized charity, such as for the education of children—providing for the aged and infirm—the insane, blind, or poor, the charity will not fail, for the want of a trustee to distribute it, but the court will provide, through trustees, for the disposition of the fund.

4. That the jurisdiction of the Court of Chancery is not to create a fund. Their powers, under the modified doctrine of *cy pres*, as it exists in this country, is merely to direct the execution of the donor's intention, and prevent the object from being deprived of the benefit intended. The court, in all of its doings, represent the persons, institutions, and classes, who are to be benefited. It is for the beneficiaries alone, that the court interposes, and when invoked by the trustees, it is only that they require the interposition of the court, to effect the purpose, and secure to the beneficiaries, the charity of which they should be the just recipients.

5. That to make a devise or grant, the object upon which the funds are to be expended or given, must be certain ; it must be such an institution, cause, or class, that the court can see and know, that the intention of the donor can be

carried out, and will be carried out. When it is not thus certain, it will be void.

6. Property may be given to create a charity. In those cases, the donor seeks only to change the nature and character of the property given, into another shape or form, and present it to the beneficiaries in this altered and modified form. Thus, in the building of school-houses, colleges, hospitals, &c., the donor directs that his money or land, be put into a building, and given in that shape. To a bible society, &c., to be laid out in the purchase of bibles, and so given. The beneficiaries cannot claim the money or land, but they can claim the building, and the bibles, and a court of chancery will compel the trustees to put it in those forms designated by the donor.

7. To constitute a charitable use, there must be a donor, a trustee, and a beneficiary. In case of a grant or demise, with or without trustees, where there is no party or parties designated who can take the property, or where they are so uncertain, that the court cannot direct intelligibly the execution of the trust, the property remains undisposed of, and falls to the heir or next of kin. A court of chancery, always acting for the beneficiaries, stops the instant it ascertains that there are none, or that they are so uncertain that it will have to act in the dark, when it sets about the application of the trust. 9 Howard, 189.

In the case at bar, it is conceded, that at the date of the deed from McKean to Chittenden and others, and at the death of McKean, and at the commencement of this suit, there was no Congregational church in Keokuk; there were no Christians united under one form of ecclesiastical government, using the creed, ritual, and ceremonies of the orthodox Congregational sect of Christians; there was no body, association, union, or collection of persons, so united, acting and associating, that could come under the description in the deed, and the very terms of the deed proves this state of the parties. It follows, that there was a grant to trustees, in trust, but no beneficiary—no object—upon which the property could be expended, or the use conferred. If this

court had then been called upon to execute the trust, it would have abandoned the task, and, in the language of Judge McLean, in 9 Howard, 159, would have said, "the property has never been disposed of" by McKean; in the place of finding it uncertain, they would have found it certain, upon a mere glance at the deed. If the deed did not dispose of the property, it certainly has never been disposed of. If there were no beneficiaries to take, there could be no disposition of the property, and the title remained in McKean, and at his death, went to his heirs and legal representatives.

The trustees could not produce or create the church contemplated. If it had been a building, they could have erected one, and if they had neglected to do so, this court would have compelled them to do it, or taken the trust property from them, and conferred the power and duty upon others. But this court could not form the church; they could not gather persons together, and require them to worship under the directed creed; and no person could claim an interest in the charity, except in such an organization. 1 Amer. Ch. Dig. 161.

The American doctrine in relation to charities, does not adopt the English doctrine of *cy pres*, only in a modified and very restricted form. It stops where prerogative, under the English, begins. It is strictly judicial. It never interposes to hold up, to sustain. It never takes hold of the property, only to apply it where the object is clear, and where the property has been disposed of in the very act that constitutes the charity. Our courts have never permitted the doctrine to go so far, as to act in the capacity of *parens patriæ*. They have never taken jurisdiction, merely because the donor intended to dispose of a charity, and exercised that jurisdiction, merely *in rem;* and, perhaps, the real distinction between the English and American doctrine, can be stated in that way. The American courts limit their jurisdiction to matters purely *in personam*. Where the persons or parties are uncertain, vague, or not in existence, or incapable of holding or taking, they say that the property

has never been disposed of, and remains in the donor or heirs. Thus, they require parties, or objects, to be pointed out, with reasonable clearness, and to be in existence, or capable of being brought into existence by the trustees; and they exercise jurisdiction, merely in aid of existing parties and objects, or in creating the subject matter of the charity through the trustees. Their action is *in personam.*

The English doctrine of *cy pres*, stops where they have found property dedicated to some charitable use; it operates upon the property, and can hold on to it, and retain it; seek the object described, or an approximate object; and if they find that the object intended, is not in existence, or cannot hold, they still retain the property, and dispose of it for some charitable purpose. They operate upon the *rem*. The American courts confine their doctrine to the execution of a grant or gift, that was complete and perfect, and capable of execution at the moment of its creation. They hold the *rem* only, to execute the intention, where that intention is complete and capable of execution by the very terms of the grant. If, when the donor executed the deed, he did not dispose of the property, it has never been disposed of; it remains to the grantor and his heirs. There is no rule of law by which the property can be divested, only by the deed. If there has been no other act, and that act did not dispose of it, surely it remains; it results that there cannot be a title in the donor, which this deed would pass at a future day; nor can it be that the deed owes its validity to a fact or circumstance, that was not in existence when it was executed. This would make the deed, an incident, not the capital circumstance. The deed would not create the estate. At first blush, it may be difficult to see why a grant for the use of a church; to an association of Christians, not in existence; to an artificial association, where there was none to receive, but there might be one, should be void. It, also, may be difficult to see, why a grant, made clearly for charitable purposes and uses, and where the particular object is indefinite, or incapable of holding, should not be held and appropriated to a kindred charity. Yet the solution is the same, to both of

these propositions. It is because it requires, in both cases, the exercise of a power not judicial; it requires the exercise of a power, which pertains to proprietorship and ownership. For we have seen, by all the authorities, that such a grant would be void at law; and it is plain, that unless a court of equity interposes and supplies acts which the party has omitted; supplies beneficiaries, where the grantor could not find any; creates, before it finds; exercises a prerogative power, before a judicial one, that such donation must fall.

There is not an American decision, of any respectability, that goes any farther than the positions above presented. A careful examination of the cases cited, will disclose, that the courts have always required that the beneficiary should be in existence, in some form, at the time the trust is created. The beneficiaries may be numerous, and general as the entire public—a class—the poor, aged, ignorant, yet whatever the object may be, it must be in existence. 19 Alabama, 821.; 7 Johns. Ch. 292; 9 Cow. 439; 4 Wend. 494; 24 Pick. 146; 9 Metcalf, 121; 3 Cushing, 358; 1 Hawk. (N. C.) 97; 2 Strobhart, 379; 4 Georgia, 404; 8 Blackf. 15; 4 Dana, 38; 8 Dana, 75; 7 B. Monroe, 73; 17 Serg. & Rawle, 88; 10 Barr, 336; 1 Swan, 19; 2 Peters, 576; 3 Peters, 99; 9 Howard, 189; *Vidal* v. *Girard's Executors*, 2 How. 128; 2 Story Eq. Juris. §§ 1154 to 1190; Willard's Equity, §§ 576 to 594. These and numerous other cases, have been cited and relied upon. The doctrine is summed up and shown in Willard's Equity, 580, from which it appears, that the courts of this country have confined their jurisdiction to cases strictly judicial. When it is known that this very question, and in this very case, has been before this court, and there decided, after full argument, it would seem that the parties might consider the question at rest.

*Samuel F. Miller*, *pro se.* [The reporter found upon the files, no argument or brief of Mr. Miller.]

WRIGHT, C. J.—It is first objected, that the deed from McKean to the trustees, did not impart notice of its contents,

because the certificate of acknowledgment was not in due form of law. If this was true, it could not, under the testimony, aid those who purchased from the heirs. The possession of this land by the trustees, and those claiming under them, as well as the known existence of this deed, as shown by the evidence, gave *actual* notice of an outstanding adverse title, and the sufficiency of this acknowledgment is, therefore, an immaterial question. If they had actual notice of this deed, they are affected by it, though there was no certificate of acknowledgment indorsed thereon. *Blain* v. *Stewart, post.* It is next urged, that this being an action for partition, the equitable rights of the parties to this land, cannot now be adjudicated, but the case must be determined alone upon the legal title; or, in other words, that in such actions, the court will alone determine who has the legal title, and that if any person claims an equity, which he insists should draw to it the legal right, he must first, in an independent action, establish that equity, and that then a court of law will take cognizance of his claim. On this point, however, we have no difficulty. The plaintiff in his petition, expressly makes these trustees parties; sets forth what he says is their pretended claim to this land; and avers that while it is invalid, it is a cloud upon his title, and asks that it may be removed. The trustees in their answer, set up their title, and call upon the plaintiff, as well as the other defendants, to answer to their claim, as to a cross bill. This they afterwards do, not objecting in any way to the form of the answer made by the trustees, or to their right to have this title thus adjudicated; and then, as if to remove all possibility of difficulty, the parties, by an agreement in writing, expressly agree that the case shall " be treated to all intents and purposes as a proceeding in chancery." Without inquiring whether there is technically a cross bill on file—whether the title under which the trustees claim is equitable, and not legal—whether this court will, in an action to partition lands, act alone upon the legal estate—it is sufficient to say, that this objection comes too late. By all their acts and agreements, those that now object, have recog-

nized the right of those claiming under the McKean deed, to have their title adjudicated in this case, whatever its character, and we shall therefore so determine it.

It is next objected, that the property conveyed is more in amount and value, than could be held by any religious society under the statute in force when the deed was made. In support of this position, we are referred to chapter 128, laws of 1843, 538.    This, as well as the succeeding chapter, were repealed, however, by the act of February 7th, 1844 (Laws of 1844, 4), and by the latter act must this question be judged.    It provides: "That any religious society in this territory, by complying with the provisions of this act, may have perpetual succession by such name as shall be designated by such society, and by such name shall be legally capable of prosecuting and defending suits in any courts of law and equity in this territory; and shall have power and authority to contract, receive, acquire, hold, enjoy, bargain, and sell, lease, mortgage, convey, and dispose of any building or buildings, erected for public worship, with the land necessary therefor, a burying-ground and parsonage for such society, and such other property as shall be applied to the support of public worship in said society, and to such means of education and charity as may be therewith connected."    This section, most clearly, does not limit the *quantity* or *value* of the property to be held, but alone restricts the purposes for which it is to be acquired and applied.    It recognizes the objects or purposes therein specified, as worthy and well deserving legislative protection and sanction, and for these purposes, the power is given to these societies to acquire and hold property, which may be either real or personal.    By this deed, this land and its proceeds, were to be held for the use and benefit of "the first Congregational Church," without designating the particular purpose or purposes to which it was to be applied.    It might, therefore, be held for and devoted to all or any of the objects designated by the statute.    It, of course, could not be devoted to any other purpose.

If the church or trustees, should misapply the trust property, a different question would arise. As it stands, however, we see nothing to sustain this objection. As to the power of ecclesiastical bodies, and other corporations, to hold lands for charitable or other purposes, see Story's Eq. Jur. § 1137; 2 Black. Comm. 268 to 274; 4 Wheat. Appendix, note 1; *Griffin* v. *Graham et al.*, 1 Hawk. 97. And that the objection to the grant, because of its creating a perpetuity, or tending to lock up the land, does not apply, the trustees having the power to alienate and invest the proceeds, see last case above cited. Also, *Moore's Heirs* v. *Moore's Devisees*, 4 Dana, 354; *Hillyard* v. *Miller*, 10 Barr, 326; *State* v. *Girard*, 2 Iredell Ch. 210.

The only remaining question relates to the validity of the deed, dependent upon the existence of a beneficiary, capable of enjoying and holding the property conveyed. This question has been argued with zeal and ability. Counsel have manifested a commendable, and even unusual care in its preparation—a care fully commensurate with the importance of the case, and the intricate questions involved. And while many topics, bearing on the principal question, have been discussed in the argument, we shall confine ourselves alone, to such, as in our judgment, are proper for the final adjudication of this controversy. And in doing this, it is proper that we first ascertain and settle from this deed, its character, object, and purpose. The evident intention of the donor was, to create a fund for the use and benefit of a church, which he desired to have organized and built up in the city of Keokuk. The management of this fund he intrusted to five trustees by name, who at that time accepted the trust, and undertook to execute the same. The very words of the grant show, that there was no such church at that time organized in Keokuk, as could then take the land, and this is abundantly shown, by the testimony, and not denied by the counsel for the trustees. Neither by the terms of the grant, had the trustees any power to bring the beneficiary or church into existence; nor is there any method therein designated, by which it may be created. The power

of the trustees only extended to the holding, leasing, and selling of the land, and the investment of the money arising from such sales and leases, for the use and benefit of such contemplated church organization, and the appropriation thereof to such purposes, when the church should be so organized.

. From the testimony, outside of the deed itself, it appears that the trustees named, as also other persons in the city of Keokuk, were members of this particular denomination, but had no organized existence.   In February, 1854, these persons, with others, first organized, or became incorporated, as a church of the character and name designated in the deed, which organization appears to have been contemplated for a number of years previous, and at no time to have been abandoned.   Under these circumstances, the question presented for our determination, is this : Can a grant to trustees, for the use and benefit of a church to be afterwards organized— with no power in them to create the beneficiary, or to appropriate the land or funds arising therefrom, for any purpose, until such organization—be upheld, so as to pass the title, if such church shall afterwards (say in seven years, as in this case) be so created or brought into existence, as to acquire and hold property, or be the recipient of a charity ?   This statement of the question, we think, is quite as strong, in view of the claims of the church, as can well be justified from all the facts.   It is, however, as near in form and substance, that made by the counsel opposed to the church title, as we have been able to state it ; and for. that reason, we shall so treat it, preferring as we always do, as far as possible to decide the very question presented.   As already stated, this question has been most fully, and we may add, very fairly argued.   Counsel have in their written and oral arguments, brought to our attention, all of the leading authorities in this country, and many of those in England, on the subject of grants and devises to charitable purposes.   We have endeavored to give to the question, that attention its importance and intricacy demands, and the more so from the fact, that it is claimed that this same question has been deter-

mined by the former judges of the court, as to this same title, which decision we are asked to overrule. And while we have concluded to sustain the title of the church to this property, yet it is with a hesitation, we would not have felt, but for the decision referred to, and the very great confidence manifested by counsel opposed to its validity. We may add, however, that we have less hesitation in so holding, from the fact that counsel who claim the benefit of the former decision as authority, admit that it does not consider the real question involved as fully, if as attentively, as its character demands. In considering this decision, we first remark upon the stage of the case upon which it was made, and the ability of the church to take this property, then and now. That was a bill in chancery, filed by Marshall, one of the present defendants, against the trustees, setting forth this deed—averring that they held the land as a mere naked trust; that at the time of the execution of the deed, there was "no Congregational church in Keokuk, nor any association or corporation known by such designation, nor has there been since such convey-ance, nor is there at this time, any such church, or any body or association, claiming to be such church;" that he had purchased the interest of certain of the heirs of McKean ; that said conveyance by McKean to the trustees, was with-out any consideration ; and that as there was no church or association in existence, upon which the estate could be cast, the said trustees held the same in trust for him. To this bill, there was a general demurrer, which was sustained in the District Court, but overruled in this court—and the case remanded, where it is now pending. A leading element in that case, as distinguished from this, is that by the demurrer, it was admitted that up to the time of filing the bill, there was no society or organization capable of taking the prop-erty. Nor was there anything to show that the trustees had taken possession of the land, or that the grantor had recog-nized, if not confirmed, the conveyance by his will. Now, the church has been organized ; it is shown that the trustees did take possession of and rent the land; and that the grantor did recognize the existence and validity of the deed by his

last will and testament. The absence of all these things, evidently had much influence in the determination of the former case. For it is said, that " had the contingency happened; had the church been organized under the restrictions of the deed, and taken to itself the use and possession of the land during the lifetime of McKean, much weight should be given to the arguments of counsel for appellees: In such a case, although the deed in itself would be legally void, as having had no grantee, and void as creating an estate *in futuro*, still the doctrine of *cy pres* might be applied, for the purpose of carrying out the intention of the grantor, under circumstances which gave notice to the heirs, or subsequent purchasers, that such intention was manifest, not only before, but after, the contingency happened. But in this case at bar, the contingency did not happen; there was no subsequent circumstance, showing a continued intention on the part of the grantor, that his heirs should be divested of their rights, upon any contingency subsequent to his death." And while we would not say, that the absence of these circumstances, controlled the determination in that case, yet we feel justified in concluding that it had much influence, as is evident from the above, as well as other parts of the opinion. Now, we think, and hope to be able to show, that these circumstances have a material bearing upon the question involved; as also, that this grant can, and must be upheld, without any reference to the doctrine of *cy pres*. If the first part of this proposition is true, then the conclusion arrived at in this case, does not necessarily overrule the other.

But before coming to this view of the case, let us examine some other positions taken in that opinion, and upon which it appears to have been mainly based. " It is obvious (says GREEN, J., in delivering that opinion), that the trustees were not vested with a freehold estate. The grantor intended to convey a legal title to them, upon certain contingencies. As trustees, the deed vested in them a contingent, naked legal title. But the use, under our statute, could only take effect upon the contingency that the *cestui que use* should be

organized or incorporated into existence." And again : "It seems obvious that no estate was created by virtue of the deed, but a kind of remainder *in futuro*, to pass upon the remote possible contingency, that the trustees should continue a valid existence, and the *cestui que use* should be created, be properly christened and located, and endued with an orthodox spirit ;" and again, " this cannot be re-garded even as a valid remainder, for it is not supported by any vested estate of freehold. An estate vesting upon a remote contingency, is void ;" and finally : " We conclude, then, that the conveyance cannot be sustained, even as a charitable use, because the intention of the grantor cannot be carried out consistently with the deed itself, nor with the established principles of common law. Nor can it be good as a contingent use, or a contingent remainder." Now, with all due respect, we must be allowed to say, that we are un-able to see what much of the matter contained in the above quotations, has to do with this case, or the question substan-tially involved. It is not denied by counsel, that this deed is sufficient, so far as the mere words of the grant are con-cerned, to vest in the trustees a fee simple title, nor indeed could it well be. It is also admitted, and properly so, that the trustees could and did take the property, if there had been certain beneficiaries in existence capable of taking the use. How, then, can it be said that " a kind of remainder was *in futuro*, to pass upon the remote possible contingency &c." or why the dictum, that the grant could not " be regarded even as a valid remainder, for it is not supported by any vested estate of freehold ?" What has the doctrine of con-tingent remainders, to do with this question ? We must con-fess that we are unable to see any, the remotest connection. Here the legal estate was a unity—there was no division—no particular estate for life or years, to one, and an estate to be enjoyed in fee simple after its termination, by some other. What particular estate preceded the remainder in this case ? Or what remainder was there ? Take the common case of a grant to A. for life, and then to the brothers and sisters of A. This latter estate is called the estate in remainder.

Was there any grant to the trustees in this case, and then to the church? Did the trustees have a particular estate carved out, with the remainder to the church? So, also, if the trustees, by the words of the grant, took an estate in fee simple, as is admitted, how would any person claim or pretend that anything could remain? If all was granted, how could there be anything left? Sir Wm. Blackstone, in speaking of this estate, says that both of these interests (the particular estate, and estate in remainder), are but one estate. The present term for years, and the remainder after, when added together, being equal to one estate in fee. They are different parts, constituting one whole, being carved out of one, and the same inheritance. They are both created, and may both subsist, at the same time, the one in possession, and the other in expectancy. 2 Bl. Com. 164. But without pursuing this inquiry further, we think we are fully justified in saying, that the church does not claim this property as the remainderman claims his estate; nor are the learning or doctrines applicable to that branch of the law, in any way connected with this case. And without other comment on specific portions of the opinion, we must say, that it appears to have strangely misconceived, or not to have carefully considered, the prominent and material questions involved in the case. We understand that McKean not only intended to, but did, convey a legal title to these trustees. By the terms of the grant, however, they held the legal title in trust for the church. And the real and only question in the case is, whether under the circumstances developed, there was such a want of beneficiaries, as that upon the death of McKean, these trustees held this estate for his heirs. And so far as the opinion in the case of *Marshall* v. *Chittenden et al.* (above quoted from), can be considered as maintaining the affirmative of this proposition, we feel constrained to overrule it. In doing so, we are not unmindful of our duty to adhere to former decisions, and especially those made by this court, and more particularly such as may be regarded as settling and establishing rules for the alienation and acquiring of property. Strong reasons, in-

deed, should be presented, before we should depart from decisions carefully considered and deliberately made. Certainty in the law is fully as much to be desired, as mere abstract perfection. In this instance, the questions involved arise for the first time in this state. The former judges of this court made a decision, and remanded the case to the court below. That case is still pending. It is not one of those cases where, for a series of years, a particular rule of property has been settled in the state, and which should not be disturbed, except for the most cogent and controlling reasons. The question is a novel one in this state. It is of the utmost importance that, at this early stage of our judicial history, we should determine it properly, if possible; and not permit a rule, hastily settled, to grow up and receive the sanction of our courts—a rule, we think, that does violence to that principle, which induces courts of chancery to give all proper encouragement and favor to charitable grants and bequests.

We come, then, to consider the question as though it was undecided in this state. And if this was a grant to an individual, we do not think it could be sustained. By the common law, all grants between individuals must be made to a grantee in existence, or capable of taking, otherwise there could be no such thing as livery of seizin. This rule does not apply, however, to grants or devises to charitable or benevolent purposes, and especially when the legal estate is vested in trustees, to hold for the use of the contemplated charity. In such cases, if the intent of the donor can be ascertained, and it be legal, courts of equity will carry it out. *Kniskern* v. *Lutheran Church of St. John and St. Peters,* 1 Sandf. Ch. 439; *Outows* v. *Eslava,* 9 Porter, 527; *Winslow* v. *Cummings,* 3 Cush. 358; *Dickson* v. *Montgomery,* 1 Swan, 348; *Town of Pawlet* v. *Clark et al.,* 9 Cranch, 292; *Burbank et al.* v. *Whitney,* 24 Pick. 146; *Zimmerman* v. *Anders,* 6 Watts & Serg. 218; *Amer. Bible Society* v. *Wetmore,* 17 Conn. 181; *Ingliss* v. *Sailors' S. H.* 3 Peters, 99; *Ex. of Burr* v. *Smith,* 7 Vermt. 241; *Bentlett* v. *Nye,* 4 Metc. 378; Story's Eq. Jur. §§ 1144, 1162, 1165, 1169, 1190; *Witman* v. *Lex,*

17 Serg. & R. 93; *Bridges* v. *Pleasants*, 4 Iredell, 27; *Profs. of Shapleigh* v. *Pillsbury*, 1 Greenl. 271, approved in *Sewall* v. *Cagill*, 15 Maine, 414.

The exercise of jurisdiction in such cases is not dependent upon the statute of 43 Elizabeth, commonly known as the statute of charitable uses. A different opinion at one time obtained in this country, but since the decision in the celebrated case of *Vidal et al.* v. *The Executors of Girard*, 2 How. 127, it is generally conceded, that the statute of Elizabeth did not create a new law, but only regulated the jurisdiction—a jurisdiction that was before that time inherent in the court over such subjects. This question was very critically examined in that case, all the leading authorities being discussed, and the common law jurisdiction our charitable trusts antecedent to this statute, fully recognized—the unanimous opinion of the court, being delivered by STORY, J., who at one time entertained a contrary view. Story's Eq. Jur. 1154. Numerous authorities might be adduced in support of this proposition, but the above are regarded as sufficient, especially as it is at this time, seldom if ever seriously controverted. In this country, also, this jurisdiction must be exercised judicially, and not as a prerogative power. If the intention of the donor can be legally executed, whether the gift is to a general charity, or specific object, it will be done; but if this cannot be accomplished, the claim of the heir will not be defeated, by appropriating the property to another and different object.

The chancellor will see that the intention of the grantor is carried out, but he will not give a different direction to the property. Though the deed may clearly manifest a benevolent or charitable disposition, it will only be executed or upheld, for the benefit of the object designed, and will not be, in favor of some other similar object. Courts in this country, in such cases, will execute the will of the benevolent donor, but cannot create an object or person, or class of persons, on whom to confer the gift. We need not add, therefore, that the doctrine of *cy pres*, at least in its original form, as administered in the English courts, has no applica-

tion here.   *Carter et al.* v. *Balfour's Admr.*, 19 Ala. 821;
*Moore's Heirs* v. *Moore's Devisees*, 4 Dana, 354; 4 Wheat.
Appendix, note 1; *Curling's Administrators* v. *Curling's Heirs*,
8 Dana, 38.   But, say counsel, this grant must be sustained
on the doctrine *cy pres*, or must fail.   We do not think that
doctrine has anything to do with this case, and are clear
that the property descended to the heir, if the deed is to be
upheld by that doctrine.   In the first place, this is not one
of those cases, which have frequently arisen, where courts
have had difficulty in administering the trust or charity,
because of uncertainty as to the object or beneficiary, or for
want of trustees to take and hold the property.   The deed
is specific as to the name and location of the church—the
trustees are named—they accept the trust, and undertake
its execution—and a mode is concisely pointed out, in which
the succession is to be kept up, in case of death or vacancy
from any cause in said board.   In this latter respect, the
case is clearly different from that of *Stone* v. *Fuller's Exe.*,
3 Vermt. 400.   Since the organization, therefore, of the
church, there can be no difficulty in carrying out the inten-
tion of the grantor, so far as any objection on the ground of
uncertainty in object, is concerned.   Neither are we asked,
to devote the grant to an object other or different from that
designed by the donor, and clearly stated in the deed there-
of.   We therefore run no hazard in violating his will, if the
property can be given to this object.   But in carrying out
this will, the integrity of the law must be preserved, what-
ever the consequences.   While courts of equity favor such
grants, and will not permit the same to fail for the want of
trustees, but will supply their places, and guard the execu-
tion of the trust, yet legal principles must be preserved, and
the rights of parties protected.   Shall the will of the donor
then, be executed or carried out?   If not, why?   The answer
is, because no beneficiary was *in esse*, at the time of the
grant, capable of taking.   We have already shown, by ref-
erence to a number of authorities (which might be multi-
plied), that this is not necessary in grants of this character.
But it is said, that in all these cases, as well as other similar

ones, the trustees had the power to create the beneficiary—to proceed with the execution of the trust; or that if the beneficiary did not exist in an incorporated form, so as to have power as such, to acquire and hold the grant, there was at least an association or class of persons, who had an existence; and further, that no case can be found similar to this, where the grant was upheld.

In view of these objections, let us examine some of the cases, to ascertain how far the courts of this country have gone in upholding such donations, where these and similar objections have been urged. In the case of the *Town of Shapleigh* v. *Pillsbury*, 1 Greenl. 271, the view taken of this question, will be sufficiently indicated by the following extract from the opinion by MELLEN, C. J. : "On these facts, it is contended by the counsel for the demandants, in the first place, that the grant by the proprietors in 1780, of the demanded premises, is void, because there was at that time, no person or persons, or corporation, capable in law of taking the estate granted;" and he then proceeds to say: "We are not aware that such grants or donations were ever considered void and inoperative, either before or since the revolution, on the principle, that no person or corporation capable of taking, existed at the time of the grant. Should such a principle be considered sufficient to defeat such grants, it would, in numberless instances, frustrate the benevolent intentions of the legislature, or of generous individuals, in the bestowment of their bounty." In *Rice* v. *Osgood et al.*, 9 Mass. 38, the part material to this question, will be found in the following extracts from the opinion by SEWALL, J., commencing on page 43 : "When the patentee, according to the condition of the grant to him, makes a grant or assignment, the estate vests, where the appropriation is to a person or corporation *in esse*, and is accepted by him, or them ; and where contingent, and to a person or corporation not *in esse*, the estate remains in the patentee, until the contingency happens, and then vests, if accepted." In this case, the grant is to trustees, who accepted at the time, and the beneficiary is now claiming the benefit of that acceptance.

In *Curling's Administrator* v. *Curling's Heirs*, 8 Dana, 38, the will of James Curling contained the following provision: "And at the decease of my wife, it is my will and desire, that my negro boy Harvey shall cease from slavery, and be emancipated and set free; and that the remaining part of my estate shall be left for the use, privilege, and benefit of a public seminary; that said property shall not be sold, but rented and hired for the purpose aforesaid." The trustees of the Trigg county seminary (where part of the testator's estate was situated), established and organized after the date of the will, were made defendants to the original bill, filed by the heirs, to have this clause in the will declared void. The devise was upheld, and this seminary, so organized, was declared to be the recipient of the testator's bounty. The case of *McGirr* v. *Aaron*, 1 Penr. & Watts, 49, was of this character: The Rev. T. Bowers, by his will, gave certain real estate to a Roman Catholic priest, who shall succeed me in this said place, to be entailed to him and his successors, in trust, and so left by him to his successors, and so on in trust, for the use therein mentioned, in succession forever. In the course of the opinion, by GIBSON, C. J., it is said, that a devise to an officiating priest and his successors, not being a corporation sole, is against the policy of the law and void, as tending to perpetuity; and that, therefore, if this devise was to be interpreted strictly, according to the meaning of the words, it would be impossible to carry it into effect. The devise was upheld, however, and not allowed to fail for want of trustees, by holding that the devise was for the maintenance of the priest, but in care of the congregation, and consequently for its benefit alone. "Now (says the court), although the congregation was not incorporated at the death of Mr. Bowers, yet, by the decisions of the court, a gift to a charity shall not fail for want of a trustee; but vest as soon as the charity acquired a capacity to take." *The Town of Powlet* v. *D. Clark et al.*, 9 Cranch, 292, very fully and ably reviews the doctrine of charitable trusts, as also the rights of corporated and unincorporated ecclesiastical bodies. We can do nothing more than give a mere

abstract of so much of the case as bears upon the question now before us. The case involved the construction of, and the rights of parties under, the royal charter of 1761, granted to the township of Pawlet, which gave certain lands, "one share for a glebe for the church of England, as by law established; one share for the first settled minister of the gospel." There was not any church consecrated and established in Pawlet, at the time of the charter, and the inquiry arose, whether, at common law, a grant so made, was wholly void, for want of a corporation having capacity to take. STORY, J., in delivering the opinion, says: "That the land must have passed out of the donors, if at all, without a grantee, by way of public appropriation or dedication to pious uses. In this respect it would form an exception to the generality of the rule, that to make a grant valid, there must be a person *in esse* capable of taking it;" and he concludes that, under such circumstances, until a parson could be inducted into such new church, the fee of its lands would remain in abeyance, or be like the *hereditas pacens* of the Roman Colle, in expectation of an heir. This would conform exactly to the doctrine of the civil law, which as to pious donations, Bracton has not scrupled to affirm, to be the law of England. "Nor (says the learned judge), is this a novel doctrine of the common law." The case of *Beatty & Richie* v. *Kurtz et al.*, 2 Pet. 556, was briefly this. In 1769, Beatty and Hawkins laid out an addition to the town of Georgetown. On the recorded plan of the town, one lot was marked out, and inscribed with these words, "for the Lutheran Church." Shortly after the appropriation, the Lutherans of Georgetown proceeded to erect on this lot a log house, which was used by them as a place for public worship, and in various other ways exercised ownership over the said lot. They, however, were never incorporated as a religious society, but consisted of a mere voluntary association or society, without any formal records of their proceedings. The question arose, whether the plaintiffs, a committee chosen by this voluntary association, could, for the church, maintain its title to the lot, upon this dedication, as

one made to pious uses. In reference to this question, it is said, that there was no doubt that the proprietor of the town intended that this lot should be appropriated for the use of a "Lutheran Church," in the town laid off by him. "But as there was not, at that time, any church, either corporated or unincorporated of that denomination, in that town, there was no grantee capable of taking the same by the grant. If, therefore, it were necessary that there should be a grantee legally capable of taking, in order to support the donation in this case, it would be utterly void at law, and the land might be resumed at pleasure. If the appropriation, therefore, is to be deemed valid at all, it must be upon other principles than those which ordinarily apply between grantor and grantee ; and we think, it may be supported as a dedication of a lot to a public and pious use." In Ohio, it is the settled and received law, that a dedication for public, pious, or charitable uses, requires no donee to give it effect (6 Ohio, 308; 7 Ib. 221); and to be equally well settled, that a trust shall never fail for want of a trustee, but that the necessary appointment may be made by the court. *Thornhill and others* v. *McCandliss,* 6–7 Ohio, 472.

The case of *Winslow* v. *Cummings et al.,* 3 Cushing, 358, we think, goes further than we are called upon to go in this case. Among the legacies contained in the will of T. S. Winslow, was the following, and expressed in the following words : "To the Marine Bible Society, I give one thousand dollars." There was no society of that name in existence, but at, or shortly before the time of making the will, there was a voluntary association known by the name of "The Boston Young Men's Marine Bible Society," but which, at the time of the testator's death, had been dissolved, or become extinct. The members of this society having afterwards held meetings, and claimed the legacy, their right thereto was the question which arose for adjudication. It was held, that this society was the one intended by the testator, and that as such, it could take the legacy. It was objected that no such society existed at the time of making the will. "As to the want of capacity to take the legacy

(says the court), by reason of having no legal existence as a corporation, that can be readily supplied by the appointment of a trustee, if the object of the legacy, and the particular use to which the testator appropriated it, can be ascertained. It seems to us that these may be ascertained, and that although this society had ceased to continue its regular organization, yet its previous existence, its well-defined objects of charity, and mode of distribution of its funds, may be resorted to, in order to determine the purpose of this legacy, and what disposition of it will effectuate the intention of the testator." 6 Peters, 431. In *The City of Cincinnati* v. *White*, it is said, that "dedications of land for public purposes, have frequently come under the consideration of this court, and the objections which have been raised against their validity, have been the want of a grantee competent to take the title, applying to them the same rule which prevails in private grants, that there must be a grantee as well as a grantor. But that is not the light in which this court has considered such dedications for public use. The law applies to them rules adapted to the nature and circumstances of the case, and to carry into execution the intention and object of the grantor, and to secure to the public the benefit held out and expected to be derived from, and enjoyed by, the dedication;" and again, that "in this class of cases, there may be instances where, contrary to the general rule, a fee may remain in abeyance, until there is a grantee capable of taking, when the object and purpose of the appropriation look to a future grantee, in which the fee is to vest." This case also affirms, that there is no well-founded distinction, so far as this question is concerned, between dedications for charitable and religious uses, and those of land for the use of a city; but that all alike, form exceptions to the rule applicable to private grants, and grow out of the necessity of the case.

In 2 Kent's Com. (7 ed.) p. 329, in the note, we have a reference to the case of *Milne* v. *Milne*, 17 Louis. Ch. R. 46, where, according to the note, it was decided under the will of Alexander Milne, in which legacies were left to two pub-

lic charitable asylums, to be, after the death of the testator, incorporated and established at Milneburgh, that the courts were bound to aid in carrying out the intention of the will. See also, *Executors of Burr* v. *Smith*, 7 Vermont, 241; *Ingliss* v. *Sailors' Snug Harbor*, 3 Peters, 99. This last case is very much in point, but the length of this opinion forbids that we should refer to it, as its importance would otherwise demand. *American Bible Society* v. *Wetmore*, 17 Conn. 181; *Zimmerman* v. *Anders*, 6 Watts & S. 218. In note 2, to section 1190, Story's Eq. Juris., it is said that, "if the object of the gift be certain, but not at present in existence, yet if its existence may be expected hereafter, the court will neither consider the gift lapsed, nor apply it to a different use," citing *Aylet* v. *Dodd*, 2 Atk. 283; *Attorney-General* v. *Oglander*, 3 Bro. Ch. 166.

Without referring to further cases in detail, we direct attention to the following, as throwing light upon this question: *Andrew* v. *New York Bible Society*, 4 Sandf. 178; *The Zanesville Canal and Man. Co.* v. *McIntyre's Ex.*, 9 Ohio, 203; *The Reformed Dutch Church* v. *Mott*, 7 Paige, 77; *Zanesville Canal and Man. Co.* v. *City of Zanesville*, 20 Ohio, 483; *Dickson* v. *Montgomery*, 1 Swan, 348; *Burbank* v. *Whitney*, 24 Pick. 146; *Porter's Case*, 1 Coke, 22; *Moggridge* v. *Thackwell*, 7 Vesey, 36; Bacon's Abrig. title Charitable Uses, E; Willard's Eq. ch. 7, § 15. We think these cases fully sustain and uphold the following, among other propositions: That a court of equity will not permit a trust to fail for want of a trustee. That grants, devises, or dedications to public, pious, or religious uses, from the necessity of the case, form exceptions to the rule, applicable to private grants, requiring a grantee as well as a grantor. That it is not necessary, in such cases, that the beneficiary should, at the time of the grant, be clothed with the power or capacity of taking the benefit of the donor's bounty; but the intention of the donor will be executed, if this capacity arises within a reasonable time thereafter. That, in the meantime, where the property is in the hands of a trustee, and the object and purpose of the grant, look to a future grantee, it will be held in abey-

ance. That it is not necessary that the trustee shall have the power to create the beneficiary, or proceed with the execution of the trust, before such creation, in order to sustain and uphold such a grant or devise; and upon .these principles, this grant may most clearly be upheld, and the intention of the grantor carried out.

A brief reference to some other points, made by counsel, and we close this opinion. We are asked, if this grant is sustained, how this court could have ordered its execution, if the church was not now organized? We answer, that in such a case, the grant would not have been upheld. In other words, we could not have given it to a beneficiary, that at the time of the decree, had no capacity to take. But there is a uniform current of authorities, to which there is, perhaps, but little, if any, exception, that if the church, asylum, school, or other object of the charity, shall exist at the time of the grant in an unorganized or unincorporated form, having no capacity as such, to take or hold the property granted, yet the subsequent incorporation will prevent the legacy or grant from lapsing, and enable the court to execute the same; and yet, in such cases, there would be no more power in the court to provide for the execution of the donor's intention, before incorporating, than though the church or school did not previously exist in an unincorporated form.

Again, and finally, was this church endowed with the capacity to take, within such reasonable time, as to enable it to claim the benefit of McKean's bounty? The answer to this inquiry, must always depend upon the circumstances of each case. In this instance, it is a part of the history of the times, that when the deed was made, Keokuk was, like many, if not most, of the towns of this state, just struggling into active existence. It had few inhabitants, and those belonging to the different religious denominations, were in the same proportion, few. As such, their want of ability, immediately to organize, build up, and sustain a separate church, cannot well be doubted. This grant expressly contemplates such want of means, and is designed to assist this

known and appreciated poverty. It is true, the church might possibly have sooner organized, but this would have given it no greater means, aside from the more immediate use of this grant, to have built a house of worship, or sustained a minister. The testimony shows, that there was, at that time, and for some years thereafter, but few members of this denomination. They attached themselves temporarily with the Presbyterians, and so continued, until having members and strength sufficient, they organized in the manner required by law, and under the peculiar government known to their own church. Under such circumstances, we should be unwilling to treat the delay as unreasonable. To so hold, would be to defeat the intentions of many benevolent individuals, designed to aid in the building up of poor and weak churches and schools, at a time in the history of all new countries, when their aid would be most needed, and accomplish the · most good. We conclude, therefore, that this case must be reversed. From the intricacy of the questions involved, we may have misapprehended the law, to the prejudice of the parties, who justly feel so great an interest in this litigation. We have endeavored to view the case in its legal aspect, influenced by· a stern sense of duty. If we have erred, we have at least the reflection, that in holding as we have, we have carried out the intention of the deceased, as expressed in his deed, and re-affirmed in his will.

Decree reversed.