# IN THE COURT OF APPEALS OF IOWA

No. 23-0038
Filed January 24, 2024

**IN THE MATTER OF THE MAX and NELDA LAUSER TRUST CREATED UNDER THE WILL OF MAX L. LAUSER, Deceased.**

**BARBARA ZELLMER,**
        Appellant.
_____

        Appeal from the Iowa District Court for Muscatine County, Jeffrey D. Bert, Judge.


        A named beneficiary of a testamentary trust appeals the district court's declaratory ruling on the proper distribution of the remaining trust assets. **REVERSED.**


        Alan R. Ostergren of Alan R. Ostergren, PC, Des Moines, and Gregory J. Kreitner of Allison & Kreitner, PC, Muscatine, for appellant.

        Terry M. Giebelstein of Lane & Waterman LLP, Davenport, for appellees Kent Egel, Brian Egel, Kelli D. Egel Forbes, Linda Lauser Hunter, Tony Jarvis, and Don Lauser.

        Curt A. Oppel of Stanley, Lande & Hunter, Davenport, for appellee Liberty Trust & Savings Bank.


        Heard by Schumacher, P.J., and Ahlers and Langholz, JJ.

**LANGHOLZ, Judge.**

This is a dispute about the proper interpretation of Max Lauser's will. Section 3.02(b) of the will names twelve beneficiaries to receive eleven equal shares of his estate if his wife has died before him. (One of the shares is designated to be split between two beneficiaries.) But Lauser died before his wife. So instead, as provided in a different part of the will, Lauser's estate passed to a trust for her benefit. And the will provides that in this scenario, upon his wife's death, the trust estate is to be divided "into eleven equal shares to be distributed according to the provisions of Sections 3.02(b) and 3.04."

If that were all the will said, we likely would not be here. But section 3.02(b) also contains one more key provision: "If any of these bequests lapses, the other bequests will increase proportionately." And here we have our fight. In one corner is Barbara Zellmer—one of the twelve named beneficiaries—who argues that this sentence means that only she and the other beneficiaries still living after the death of Lauser's wife should receive equal, proportionally increased shares of the trust estate. In the other are six children or grandchildren (or "issue," in probate speak) of named beneficiaries who survived Lauser but died before his wife. They urge that the sentence does not affect the trust distribution—that the shares of the deceased named beneficiaries should go to their issue rather than be divvied up.

Zellmer has the better argument. We must interpret the will to give effect to all its provisions. And we see no other possible meaning for the disputed sentence than an expression of intent to limit the distribution of the estate to the named beneficiaries and not their issue. We thus reverse the district court. The trust estate must be distributed in three equal shares to the living beneficiaries.

I.

*Max Lauser's Will.* In his 1995 will, Max Lauser set up three possible paths for the distribution of most of his estate after his death. First, if his wife dies before him, he names twelve beneficiaries to receive eleven equal shares of the residue of his estate. Section 3.02(b) governs this path, providing:

> b. If my wife does not survive me, I give the residue of my estate in eleven equal shares as follows:
>
> (1) One share to United Methodist Church of Wilton, Iowa.
>
> (2) One share to my brother, Robert H. Lauser . . . .
>
> (3) One share to my brother, Kent E. Lauser . . . .
>
> (4) One share to my sister, Harriet J. Jensen . . . .
>
> (5) One share to my sister, Miriam J. Sanson . . . .
>
> (6) One share to my nephew, James Lauser . . . the sole heir at law of my deceased brother, Richard D. Lauser.
>
> (7) One share to my nephews, Gregory Lauser . . . and Paul Lauser, . . . the heirs at law of my deceased brother, Charles D. Lauser.
>
> (8) One share to my sister-in-law, Norma L. Grimm . . . .
>
> (9) One share to my niece, Barbara Zellmer . . . .
>
> (10) One share to my sister-in-law, Farene L. Harmsen . . . .
>
> (11) One share to my brother-in-law, Kenneth D. Egel . . . .
>
> If any of these bequests lapses, the other bequests will increase proportionately.

The omitted parts of this section merely identify the address and social security number of each named beneficiary. Except the church, all the named beneficiaries are family members of Lauser and his wife. The Lausers had no children.

The second and third paths are approached only if Lauser's wife survives him. If so, and she chooses to accept the bequest, the entire estate passes directly to her. But if she disclaims all or some of the bequest, the disclaimed estate passes to a trust created and governed by Articles 4 and 6 of the will.

On this third, circuitous path, the trustee is directed and empowered by the will to support Lauser's wife throughout her life with all the trust's income and as much of its principal as is needed "for her health and maintenance in reasonable comfort." And after her death, section 4.03 of the will provides that "the trustee shall divide the trust estate into eleven equal shares to be distributed according to the provisions of Sections 3.02(b) and 3.04." Section 3.04—which appears to have little relevance—provides that Lauser's wife is deemed to survive him if the order of their deaths cannot be established and that she may be a beneficiary of the trust even if she disclaims a bequest under the will. And section 3.02(b), of course, circles us back to the contingent residuary bequests to twelve beneficiaries and the directive that "[i]f any of these bequests lapses, the other bequests will increase proportionately." Finally, the will directs that "[a]fter dividing the trust estate, the trustee shall distribute the shares."

*Administration of the Will and Trust.* Two years after executing the will, Lauser died. His wife was still alive. And she chose path three—disclaiming the estate in favor of creating the Max and Nelda Lauser Trust under the will. In accordance with the will, a local bank was appointed trustee, and the trust supported Lauser's wife for her life. It was not relevant then—since Lauser's wife survived him—but all twelve of the beneficiaries named in section 3.02(b) were still alive (or in existence, in the case of the church) at the time of Lauser's death.

Twenty-four years later, Lauser's wife died. During those intervening years, eight of the twelve named beneficiaries also died. Six of those eight were survived by children and, in some cases, grandchildren (their issue); two died without any issue.[1] And only four named beneficiaries were still alive (or in existence): Appellant Barbara Zellmer, Gregory and Paul Lauser (splitting a single share), and the United Methodist Church in Wilton.

*This Proceeding.* In July 2022, the trustee requested a declaratory ruling "as to who should receive the remainder of the trust assets." The trustee argued that the assets should be distributed in three equal shares only to the beneficiaries who were still alive because of the final sentence in section 3.02(b) directing proportional increases in the shares if any bequest lapses. Six children or grandchildren of two named beneficiaries—who survived Lauser but died before his wife—objected to the trustee's position.[2] These Objectors argued that the shares of named beneficiaries with issue still alive did not lapse and should be distributed to the beneficiaries' issue rather than proportionally increasing the other named beneficiaries' shares. One of the named beneficiaries—Zellmer—also weighed in, supporting the trustee's interpretation of the will.

None of the parties offered any extrinsic evidence of the will's meaning, except for a summary chart of the Lausers' family tree, including both the named

---

[1] The six deceased beneficiaries with surviving issue are Kent E. Lauser, Harriet J. Jensen, Mariam J. Sanson, Norma L. Grimm, Farene L. Harmsen, and Kenneth D. Egel. Robert H. Hauser and James Hauser died without having any children.

[2] Three of the Objectors—Brian Egel, Kent Egel, and Kelli Egel Forbes—are the surviving children of Lauser's brother-in-law Kenneth D. Egel. The other three are the only surviving issue of Lauser's brother Kent E. Lauser: two of his five children—Linda Lauser Hunter and Don Lauser—and his only grandchild, the son of one of his deceased children—Tony Jarvis.

beneficiaries and family members who were not named and showing whether and when any family members died. Comparing this summary—which both parties concede may be considered—to the will, we can see that Lauser named all of his and his wife's siblings who were living at the time he executed the will. In place of the only two siblings who died by the time he executed the will, he named those siblings' children, specifying that his brother's two sons would split a single share. And while Lauser and his wife had many other nieces and nephews whose parents were then still living, he named only one of them—Zellmer—to receive an independent equal share of her own even though her mother was also named as a beneficiary.

The district court ultimately agreed with the Objectors rather than Zellmer and the trustee. The court reasoned that under the Iowa Trust Code, a beneficiary's issue receive the beneficiary's share when the beneficiary dies before becoming entitled to it unless the terms of the trust provide for an alternate beneficiary or impose an express condition of survivorship. *See* Iowa Code § 633A.4701(2), (3), (8) (2022). And looking at the terms of the trust in the will, the court saw no language providing for an alternate beneficiary or requiring survivorship.

Instead, the district court heavily weighed section 4.03's directive to "divide the trust estate into eleven equal shares." According to the court, this showed that "[e]ach share of the Trust was separate and distinct, and intended to be permanent, provided the placeholder had issue." And the court discounted the relevance of section 3.02(b)'s directive to "increase proportionately" the shares "[i]f any of these bequests lapses" because, in the court's view, that section only shows

that Lauser "intended to 'proportionally' reduce the shares where the beneficiaries took immediately after his death."

The district court thus ruled that the trust estate must be divided into nine equal shares. (Two of the named beneficiaries died without having any children, and all the parties agreed that their shares should be distributed by proportionally increasing the other shares.) And the court decided that the shares of the deceased named beneficiaries must be distributed to their issue, including the Objectors. Around the time of the court's ruling, the trust estate was valued at about $1.5 million.

Zellmer now appeals. The Objectors defend the district court's judgment.

## II.

We review the district court's declaratory ruling interpreting the terms of Lauser's will that govern the Max and Nelda Lauser Trust de novo. *See In re Will of Uchtorff*, 693 N.W.2d 790, 793 (Iowa 2005); *see also* Iowa Code §§ 633.33, 633A.6101; Iowa R. App. P. 6.907. A court interpreting the terms of a trust created under a will is guided by one "polestar"—"the intent of the testator" who wrote and executed the will. *In re Est. of Rogers*, 473 N.W.2d 36, 39 (Iowa 1991). We ask "not what the testator meant to say, but rather what is the meaning of what the testator did say." *Id.* So we look to the text "within the four corners of the will," including the context gleaned from "the scheme of distribution." *Id.* We may also look to "the surrounding circumstances at the time of the will's execution" and "the existing facts" in our quest to better understand that intent. *Id.*

A court must seek to give each part of the will "meaning and operation if possible" because we "assume[] that each part of the will was incorporated by the

testator with some definite purpose, and it should not be discarded or disregarded without sound reasons." *In re Est. of Roberts*, 171 N.W.2d 269, 272 (Iowa 1969) (cleaned up). And in discerning that meaning, we must read the will "as a whole, each part in connection with every other part and with the entire will." *Id.* at 271–72.

So keeping these principles in mind, who gets the assets remaining in the Max and Nelda Lauser Trust? We start with section 4.03, which gives Lauser's top-line answer: "After my wife's death, the trustee shall divide the trust estate into eleven equal shares to be distributed according to the provisions of Sections 3.02(b) and 3.04." And since under that section, distribution must be "according to the provisions of Sections 3.02(b) and 3.04," we turn to section 3.02(b) to really dig in.[3]

Right away, the first seven words of that section present a wrinkle. Section 3.02(b) kicks off with a condition that it applies "If my wife does not survive me." And of course, she did. Indeed, section 4.03's instruction to look to section 3.02(b) would only ever be applied if Lauser's wife *did* survive him and chose to let his estate fund the trust. But we must give effect to section 4.03 and its instruction to use the provisions of section 3.02 to distribute the trust estate if at all possible. *See Roberts*, 171 N.W.2d at 272.

We can do so without much difficulty by recognizing that Lauser wrote section 3.02(b) to apply in the context of disposing of the residue of his estate at the time of his death if his wife had died first. But section 4.03 requires its

_____

[3] We see no provision in section 3.04 of the will that has any applicability to the proper distribution. And neither party has argued that any provision does.

application in a different context—disposing of the remaining trust assets after it has completed supporting her throughout her life. So to best reflect Lauser's intent expressed in section 4.03, we must translate the substantive distribution instructions of section 3.02 from the language used in the residuary context to the trust-distribution context in which it must now be applied. *Cf. Uchtorff*, 693 N.W.2d at 798 (describing application of trust terms written in one historical context to a new statutory context as "translation" and quoting Justice Holmes to explain that, "We must think things not words, or at least we must constantly translate our words into the facts for which they stand, if we are to keep to the real and the true" (quoting Oliver Wendell Holmes, Jr., *Law in Science and Science in Law*, 12 Harv. L. Rev. 443, 460 (1899))). We must strive to give meaning to as many of the substantive instructions—Lauser's intent—expressed in section 3.02 as we can. *See Roberts*, 171 N.W.2d at 272.

Focusing on these substantive instructions, section 3.02 directs an initial division into eleven shares, just as section 4.03 does. (In our translation, we ignore that section 3.02(b) by its literal terms divides the residue of Lauser's estate rather than the trust.) It names twelve specific beneficiaries to receive those shares—one each, except for two of Lauser's nephews who split a share in place of their deceased father. And then it directs "[i]f any of these bequests lapses, the other bequests will increase proportionately."

To resolve the parties' dispute over how this last sentence should apply in the context of the trust distribution—if at all—we must first understand how it would have applied in the original context of the residuary distribution. The sentence has two parts: a condition and an operative clause that takes effect if the condition is

met. And there is no real dispute about the operative clause; if it takes effect, the applicable share is alternatively given to all the remaining beneficiaries, increasing their shares proportionally. But when is the condition met because one of the "bequests lapses"?

Black's Law Dictionary defines a lapse, when used in the context of wills and estates, as "[t]he failure of a testamentary gift, esp. when the beneficiary dies before the testator dies." *Black's Law Dictionary* 885 (7th ed. 1999); *see also id.* (defining the verb form, in the context of a devise, as "to become void"). Iowa precedent agrees. *See Jensen v. Nelson*, 19 N.W.2d 596, 600 (Iowa 1945) (explaining that a lapse generally means a gift "which has become inoperative because of the death, in the lifetime of the testator" of the named recipient but recognizing it "is occasionally used to apply to a gift by will that fails for some reason other than" that). And the most common way a lapse occurs is when a person dies before becoming entitled to the gift. *See id.*

This type of lapse comes from a fundamental principle of the common law: you cannot give property to a person or entity that does not exist. *See Miller v. Chittenden*, 2 Iowa 315, 368 (1856) ("By the common law, all grants between individuals must be made to a grantee in existence, or capable of taking, otherwise there could be no such thing as livery of seizin."); *In re Est. of Staab*, 173 N.W.2d 866, 871 (Iowa 1970) (holding that a devise to nonprofit corporation "not in existence at the date of decedent's death" lapsed because the nonprofit "cease[d] to be a body corporate" and thus "was not qualified to accept and receive the devise"); *Est. of Wittman v. Huston*, 215 N.W.2d 223, 224 (Iowa 1974) ("A dead

person cannot inherit."). Like a quarterback attempting a pass to a wide receiver who is out of bounds, the attempted transfer fails as incomplete. It lapses.

In deciding whether a bequest has lapsed—especially due to death of the recipient—it matters when transfer of the property right occurs. Because if the transfer occurs before the death, it is still good. No lapse. And with the pass complete, we do not care whether the receiver then runs out of bounds. Even if the recipient later dies, the property has transferred and can be passed on through a will or the laws of intestacy. *See In re Est. of Mikkelsen*, 211 N.W. 254, 255 (Iowa 1926) (noting that "[t]here is no doubt that if [the bequest recipient] had survived his father though for only an instant, he would have taken the devise" directly under the will and his heirs would have received the same rights as him).

As for that timing in the context of a bequest in a will, longstanding common law tells us that the transfer happens at the death of the testator making the bequest unless vesting is postponed further by the will's terms. *See Floerchinger v. Williams*, 148 N.W.2d 410, 413 (Iowa 1967) ("While the vesting of an interest in an estate may be postponed until some time subsequent to the death of a testator[,] the well established rule is that a will speaks from the death of the testator."); *In re Est. of Lundgren*, 98 N.W.2d 839, 841 (Iowa 1959) (explaining that "[t]he essential characteristic of a testamentary instrument is that it operates only upon and by reason of the maker's death" and only at that time "acquires a fixed status and operates as a transfer of title"). Because all this logic is so basic and fundamental, courts often jump to summarize its most common bottom line in shorthand: "A bequest lapsed at common law when it was made to someone who predeceased the testator." *In re Est. of Micheel*, 577 N.W.2d 407, 409 (Iowa 1998).

This common-law rule was viewed by many, including our legislature, as too harsh to be the default governing rule. *See id.* So we have had an antilapse statute modifying this rule on the books since the earliest days of the Iowa Territory. *See* The Statute Laws of the Territory of Iowa, Wills and Administrations, § 14, at 508 (1839). The current version of that statute, which has been in effect since a few months before the execution of Lauser's will, provides that surviving issue still inherit property given in a will to a named beneficiary who dies before the testator "unless from the terms of the will, the intent is clear and explicit to the contrary." Iowa Code § 633.273(1); *see also* 1995 Iowa Acts ch. 63, § 5. The statute does not "alter a testator's intent" but rather supplies intent "where none exists." *In re Est. of McCarthy*, 126 N.W.2d 357, 361 (Iowa 1964).

Because this antilapse statute only applies absent contrary intent clear and explicit from the terms of the will, the statute would not affect the operation of Lauser's will. The final sentence of section 3.02 with its directive to "increase proportionately" the other bequests "[i]f any of these bequests lapses" falls squarely within the sort of will terms previously found to express such a contrary intent. *See Jensen*, 19 N.W.2d at 599–601 (finding contrary intent from term giving equal shares of "residue of my estate, including lapsed legacies"); *see also In re Est. of Phelps*, 126 N.W. 328, 329–30 (Iowa 1910) (finding contrary intent from terms that provided for substitute beneficiaries, including term dividing "any of my estate that may fail, for any reason to pass under the foregoing terms and conditions"); *Fischer v. Mills*, 85 N.W.2d 533, 538 (Iowa 1957) (finding contrary intent from devise of one dollar to granddaughter with statement that "I feel that her father had received his share of my property").

Thus, in section 3.02(b)'s original context of distributing the residue of Lauser's estate, one of Lauser's bequests would lapse if the named beneficiary dies (or ceases to exist, in the case of the church) before Lauser died. The pass would not have been completed. And those lapsed shares would instead be given proportionally to the other named beneficiaries.

What's more, we can infer that Lauser intended to ensure that only the named beneficiaries would receive the bequest. Without Lauser's added sentence, the antilapse statute would have provided that the shares would pass to the issue of any named beneficiary who had died. But with the sentence, they would not. And indeed, we can conceive of no other meaning for the sentence than to provide for an alternative method of distributing the shares of named beneficiaries who were not alive to receive them. Lauser's decision to include the sentence in section 3.02(b) thus expresses a clear intent to distribute his estate to only those named beneficiaries who are alive to receive the shares.

Now that we understand how this last sentence of section 3.02(b) would have applied to distribute the residue of Lauser's estate if his wife had predeceased him, we can return to consider how it applies at the end of the path Lauser's assets actually traveled. The Objectors contend that the answer is simple: It doesn't. They make two main arguments in support of their view that the final sentence has no applicability under section 4.03. Neither holds up.

First, they contend, consistent with the reasoning of the district court, that section 4.03's opening direction to "divide the trust estate into eleven equal shares" shows a different intent to create eleven "permanent" shares of the trust not subject to further divvying up by the last sentence of section 3.02(b). But there's nothing

different about the opening of sections 4.03 and 3.02(b) aside from the assets being divided. Section 3.02 begins with instructions to give "eleven equal shares" of the estate's residue, just as section 4.03 begins with dividing the trust "into eleven equal shares." Yet, as we have already discussed, this initial division of the residue under section 3.02(b) is just the starting point. The final sentence then instructs that lapsed shares get redistributed to proportionally increase the others. Thus, the initial division into eleven shares in section 3.02(b) does not create permanent shares. We see no reason the same language should be given a different meaning when it appears in section 4.03.

The Objectors' intense focus on the opening of section 4.03 also overlooks the section's key operative language about what is done with those eleven shares: they are "to be distributed according to the provisions of Sections 3.02(b) and 3.04." This directs us to apply all the provisions of section 3.02(b) governing distribution. It would be odd indeed to use nearly identical language in both sections as a basis to ignore another substantive provision—the last sentence—in section 3.02(b). Rather, the clean alignment between the openings of both sections 4.03 and 3.02(b) show that the distribution is to function the same, just in two different contexts: the division of the residue of Lauser's estate and the division of the trust estate. Both start with dividing into eleven shares. And both should continue with applying the rest of "the provisions of section 3.02(b)"—because that is what the text of section 4.03 requires.

Next, the Objectors contend that even if we looked to the last sentence of section 3.02(b) in the context of the trust distribution, it could never apply because a lapse necessarily refers to a beneficiary dying before a testator. But as our

earlier journey through first principles illustrates, that is too narrow a view of the term "lapse." *See Jensen*, 19 N.W.2d at 600*.* And even the shorthand description that "[a] bequest lapsed at common law when it was made to someone who predeceased the testator," *Micheel*, 577 N.W.2d at 409, does not claim to be a description of the *only* way a bequest lapses at common law.[4] So it does not change the meaning of the term. Nor does it negate the underlying first principles, which still apply outside this one—admittedly most common—context.

Lauser chose to use this general term "lapse" in the last sentence of section 3.02(b), rather than a more specific and narrow condition that the beneficiaries need only survive him. So we see no reason not to consider the sentence's application in the context of distributing the trust too. All the more so when the inclusion of that sentence shows only one clear intent: to limit the distribution to the twelve beneficiaries expressly named in the will.

Having rejected the Objectors' answer of ignoring the last sentence of section 3.02(b), we must still decide how that sentence *does* apply in section 4.03's context of distributing the trust. And it applies much the same as it does in its original context—with one key difference. Recall that in deciding whether a transfer of property lapses due to death of the recipient, the timing of the transfer is critical? That timing is different here for the trust distribution compared to the

---

[4] Saying that a lapse occurs when a beneficiary dies before the testator does not mean that a lapse can only result from the beneficiary dying before the testator. Nor does it mean that a lapse cannot occur when the beneficiary survives the testator. Both misreadings are logical fallacies—affirming the consequent and denying the antecedent, respectively. *See In re Stewart Foods, Inc.*, 64 F.3d 141, 145 & n.3 (4th Cir. 1995); *State v. Booker*, 989 N.W.2d 621, 633–34 (Iowa 2023).

original residuary will bequests. Rather than being effective at Lauser's death, the transfer is not effective until his wife's death.

This divergence is driven by the Iowa Trust Code.[5] Under the Trust Code, "[u]nless otherwise specifically stated by the terms of the trust, the interest of each beneficiary is contingent on the beneficiary surviving until the date on which the beneficiary becomes entitled to possession or enjoyment of the beneficiary's interest in the trust." Iowa Code § 633A.4701(1); *see also Uchtorff*, 693 N.W.2d at 799 (explaining that the "Iowa Trust Code completely reverses the common law preference for vested interests and deems all interests contingent upon survival to the time of possession unless specifically stated otherwise"); Martin D. Begleiter, *Son of the Trust Code—The Iowa Trust Code After Ten Years*, 59 Drake L. Rev. 265, 370–76 (2011) (explaining "the basic principle of [section 633A.4701(1)] and some treatment of the reasons lawyers and courts have trouble with the concepts involved").

Lauser's wife was the sole beneficiary of the trust so long as she was living. The beneficiaries named in section 3.02(b) had no right to possession or enjoyment of any interest in the trust at least until she died. And no terms of the will specifically give any earlier vested right to the beneficiaries. Under the Trust

---

[5] The Iowa Trust Code applies to the Max and Nelda Lauser Trust because, with exceptions not applicable here, it "applies to all trusts within the scope of this trust code, regardless of whether the trust was created before, on, or after July 1, 2000." Iowa Code § 633A.1106(1). And it applies in proceedings started after July 1, 2000, as this one was in July 2022. *See id.* § 633A.1106(2); *In re Clement Tr.*, 679 N.W.2d 31, 36 n.1 (Iowa 2004); *Lalk v. Bernabe*, No. 11-0392, 2012 WL 2122230, at *6 (Iowa Ct. App. June 13, 2012). The Objectors agree that the Trust Code applies, and neither party has argued that applying the Trust Code here would be unconstitutional.

Code, their interests were thus contingent—and not effective to transfer any rights to them—until Lauser's wife's death. *See* Iowa Code § 633A.4701(1).

And so, just as in section 3.02's original context, if any named beneficiaries die before the transfer occurs—on Lauser's wife's death—their shares lapse. And the other shares must be proportionally increased. Because the timing of the transfer differs, the relevant death—Lauser's wife's rather than his own—also differs. But we are still giving the sentence the same meaning in either context.[6]

Even if lapse is not a term usually applied in the context of an interest granted in a trust, we think its concept translates easily. *Cf. Uchtorff*, 693 N.W.2d at 798. And the fundamental common law principles remain the same. "A dead person cannot inherit," *Wittman*, 215 N.W.2d at 224—whether receiving from the residue of Lauser's estate or an interest from a trust. And remember, the last sentence of section 3.02 shows a clear intent to limit distribution to only the beneficiaries named in section 3.02. We see no reason that Lauser would have a different intent in this second context.

This interpretation is supported as well by the broader distribution scheme. To be sure, Lauser gave not just to his and his wife's siblings; he also gave to the children of two of the siblings who died before he executed the will. And if that were the entire scheme, it might suggest Lauser would want the other shares to

---

[6] Of course, the effects of the sentence's application are different. But those differences do not create any logical conflict. Because Lauser's wife was alive when he died, section 3.02(b) was never triggered to apply in the context of the residuary bequests. It came into effect the first and only time upon her death under the terms of section 4.03 to distribute the trust. Indeed, under the text and structure of the will, section 3.02(b) would only ever be called into operation a single time—always after both Lauser and his wife had died.

pass to the named beneficiaries' issue too or at least be neutral to the analysis. But Lauser also included Zellmer—the only one of many nieces and nephews with their parents still living to receive an independent equal share of her own—despite her mother also being named as a beneficiary. While we do not know what motivated this special purpose, we must assume Lauser had one. And it would be disturbed by passing on all the other shares to the deceased beneficiaries' issue rather than limiting the distribution to only those beneficiaries named by Lauser. *Cf. Jensen*, 19 N.W.2d at 600–01 (looking to distortion of the scheme in deciding whether a will expresses an intent contrary to the antilapse statute).

The Objectors seek refuge from this interpretation of the trust's terms back under the Trust Code. But it cannot provide them cover from Lauser's intent. True, the Trust Code contains a default savings provision—much like our antilapse statute—that gives the interest of a beneficiary who "dies prior to becoming entitled to possession or enjoyment of" the interest to the beneficiary's "issue who are living on the date the interest becomes possessory." Iowa Code § 633A.4701(3). But that provision applies only if "no alternate beneficiary is named in the trust." *Id.* And only if the interest is not "subject to an express condition of survivorship imposed by the terms of the trust." *Id.* § 633A.4701(8). And like all the Trust Code, only if there is not a contrary trust term. *See id.* § 633A.1105 ("The terms of a trust shall always control and take precedence over any section of this trust code to the contrary.").

Sections 4.03 and 3.02(b), and especially the last sentence directing that "[i]f any of these bequests lapses, the other bequests will increase proportionately," are contrary trust terms that prevent application of the default savings provision of

the Trust Code under any of these three exceptions. *See id.* §§ 633A.1105,.4701(3), (8). So this is not a case in which we must look to the default rules because no specific direction was provided in the will. *Cf. Lalk v. Bernabe*, No. 11-0392, 2012 WL 2122230, at *4–5 (Iowa Ct. App. June 13, 2012). Rather, it is in many respects the mirror image of *In re Will of Uchtorff*, 693 N.W.2d 790, 797–99 (Iowa 2005), where the supreme court rejected application of the Trust Code—and thus held that an interest transferred sooner than the default rule—because of express terms of the trust. But there, as here, it is the text of the governing trust terms—not the Trust Code—that controls. *See Uchtorff*, 693 N.W.2d at 798–99.

In sum, to distribute the trust estate in compliance with the trust terms in the will, the trustee must first "divide the trust estate into eleven equal shares." Then, to "distribute[]" those shares "according to the provisions of Sections 3.02(b) and 3.04," the trustee must proportionally increase the shares of the beneficiaries named in section 3.02(b) who are still alive or in existence with the lapsed shares of those beneficiaries who have died.

We have reached this result without considering our own "notions of fitness and propriety" because we are "mindful that courts have no more authority to make wills for the dead than contracts for the living." *Staab*, 173 N.W.2d at 870. Indeed, it is our duty "to uphold and enforce a will after death" just as we must "uphold and enforce an individual's contracts made during his life." *Id.* And thus, our interpretation seeks only to best reflect what Lauser meant by what he actually said in the will—without discarding or adding any text. *See Roberts*, 171 N.W.2d at 271–72.

Finally then, we apply this proper interpretation of Lauser's will as requested by the trustee. Only four named beneficiaries are still alive. And two of those are directed by section 3.02(b) to split a single share. So the trustee must distribute the remaining assets of the Max and Nelda Lauser Trust in three equal shares: one to Barbara Zellmer, one split between Gregory and Paul Lauser, and one to the United Methodist Church in Wilton, Iowa.

**REVERSED.**